RECEIVED

OCT 1 0 2023

CLERK, U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY_____DEPUTY

FILED

OCT 1 0 2023

CLERK, U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY_____DEPUTY

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS

TURTLE ISLAND FOODS SPC d/b/a THE
TOFURKY COMPANY, and the PLANT
BASED FOODS ASSOCIATION,

     *Plaintiffs,*

v.

GREG ABBOTT, in his official capacity as
Texas Governor; JENNIFER A. SHUFORD, in
her official capacity as Commissioner of State
Health Services; CECILE ERWIN YOUNG, in
her official capacity as Executive Commissioner
of the Texas Department of Health and Human
Services Commission; and Attorney General
KEN PAXTON, on behalf of himself and all
Texas prosecuting attorneys,

     *Defendants.*

Case No. 1:23-cv-01032

## AMENDED COMPLAINT FOR DECLARATORY
## AND INJUNCTIVE RELIEF

Plaintiffs Turtle Island Foods d/b/a the Tofurky Company and the Plant Based Foods

Association (PBFA) bring this suit under the First Amendment, dormant Commerce Clause, the

Due Process Clause, and the Supremacy Clause of the Constitution because Texas's new law relating

to the labeling of "analogue" and "cell-cultured" products (the Law)[1] institutes an unreasonably

burdensome and protectionist trade barrier that contravenes and is preempted by federal law and

imposes vague standards on Tofurky and other PBFA members who use words associated with

meat products to describe products that are clearly marketed and packaged as 100% plant-

based/vegan. The law also imposes vague and unnecessary restrictions on the labeling of cultivated[2]

---

[1] SB 664; Tex. Health & Safety Code Ann. § 431.082 (as amended); §§ 431.0805, 433.0415.
[2] Cultivated meat is also referred to as "cell-cultivated" or "cell-cultured" meat.

meat products, which will be labeled in accordance with rules, guidance, and approvals set forth by the United States Department of Agriculture or the United States Food and Drug Administration.

## INTRODUCTION

1.      Plant-based meats are foods that approximate the texture, flavor, and appearance of meat from animals. Plant-based meats are typically made from soy, peas, tempeh, wheat, jackfruit, textured vegetable protein, or other vegan ingredients. Countless varieties of plant-based meats are currently available in grocery stores, restaurants, and from other retailers in Texas.

2.      Consumers buy plant-based meats for a variety of reasons. Some choose plant-based meats out of concern for the environment or animal welfare; some choose plant-based meats for health reasons; some avoid animal meats for religious reasons; and some simply wish to diversify their dining habits.

3.      Plant-based meat producers rely on their ability to differentiate their products from animal-based meat products. They convey to consumers that their products contain no animal-derived ingredients in a variety of different ways. For example, they may prominently display a "certified plant-based" or vegan seal; they may use terms like "veggie," "vegetarian," "vegan," "plant-based," or "meatless" alongside words like "sausage" or "burger (*e.g.,* "veggie sausage" or "plant-based burger"); they may display "veggie"-type qualifiers elsewhere on the front of package in a prominent position; they may fancifully misspell meat terminology like "chik'n" or "pep'roni"; or they may employ a combination of these methods. See Illustration 1 below, at paragraph 41, for examples.

4.      Like all other food companies, plant-based meat producers must comply with the federal Food, Drug and Cosmetic Act's (FDCA) provision that prohibits any marketing or

packaging that is "false or misleading in any particular,"[3] as well as FDCA requirements governing the names of products—*i.e.*, that the common or usual name of the product (or "statement of identity") must be truthful and not misleading and may be established by common usage.[4] This statement of identity provision sets forth the exact requirements, including placement and prominence, of these products' names. To date, there is no evidence that consumers are confused by plant-based meat producers' marketing, packaging, or naming conventions.

5.     Despite this, the Law attempts to implement additional burdensome, impractical, and unclear disclosure requirements on plant-based meat producers that go beyond federal law and create a patchwork of requirements—making the sale of plant-based products impracticable or impossible on a nationwide basis.

6.     Cultivated meat is real animal meat (including seafood and organ meats) created from real animal cells. Cultivated meat is made by taking a small sample of cells from an animal or, in the case of poultry, sometimes from an egg or feather. The cells are then grown in bioreactors, also known as cultivators. Similar to what happens inside an animal's body, the cells are fed an oxygen-rich cell culture medium. The cells differentiate into the skeletal muscle, fat, and connective tissues that make up meat. The meat is then harvested, prepared, and packaged into final products. These end products are real animal meat, produced without the need to grow and slaughter live animals.

7.     Because cultivated meat is made of real animal proteins and is indistinguishable from conventional meat at a cellular level, consumers who have intolerance or allergies to conventional meat will also be allergic to cultivated meat from the same species. Proper labeling of cultivated meat

---

[3] 21 U.S.C. § 343(a).

[4] 21 C.F.R. §§ 102.5 and 101.3.

is thus important to provide consumers accurate information about potential allergens.

8.    Processes for growing cultivated meat are well understood and two companies are already selling cultivated meat in restaurants in the United States. This emerging technology has attracted major corporate investors such as Tyson and Cargill, as well as individual investors such as Bill Gates and Richard Branson.

9.    Cultivated meat is not yet available for retail sale in grocery stores.

10.    The Law expressly considers a food to be misbranded

if it is an analogue product of meat, a meat food product, poultry, a poultry product, an egg product, or fish, unless its label bears in prominent type equal to or greater in size than the surrounding type and in close proximity to the name of the product one of the following: (1) "analogue"; (2) "meatless'" (3) "plant-based'" (4) "made from plants"; or (5) a similar qualifying term or disclaimer intended to clearly communicate to a consumer the contents of the product. . ."[5]

11.    In other words, the Law forbids plant-based meat producers from selling their products unless they include a disclaimer on their product labels in the same type size or greater than the "surrounding type" and in "close proximity" to the "name of the product" that their plant-based products are not meat derived from animals.

12.    The Law also expressly requires a cultivated product to be labeled

in prominent type equal to or greater in size than the surrounding type and in close proximity to the name of the product using one of the following: (1) "cell-cultured"; (2) "lab-grown"; or (3) a similar qualifying term or disclaimer intended to clearly communicate to a consumer the contents of the product.[6]

13.    Compliance with the Law would require Tofurky and other PBFA members to fundamentally redesign their FDCA-compliant product labels and corresponding marketing materials. And due to the Law's vague language, plant-based producers have no way of knowing *how* to determine which of their labels comply with the law. Plant-based meat producers across the

---

[5] Tex. Health & Safety Code § 431.082(d-1).
[6] Tex. Health & Safety Code § 433.0415(b).

country, including Tofurky and other PBFA members, would be forced to spend millions of dollars in an attempt to develop Texas-specific labels, or attempt to avoid the Texas market altogether—which, thanks to the nature of packaged food distribution, is impossible. They would also lose the ability to freely, flexibly, and truthfully label their products; and even if their products are truthfully and accurately labeled, they may *still* run afoul of the Law. Thanks to the Law, companies also lose the safe harbor that compliance with the FDCA's nationally uniform labeling scheme currently provides. Even if the Law's requirements were clear, it would impose unreasonably burdensome disclosure requirements on plant-based meat producers. See Illustration 2 below. These harms resulting from the Law, which are borne primarily by out-of-state businesses, are not justified by any legitimate local interest.

14.     The Law goes into effect on September 1, 2023, less than four months after it was enacted on May 15, 2023. It would be logistically impossible for plant-based meat producers with national distribution to change their product labels in such a short period of time.

15.     The Law suppresses innovation, impedes the free flow of commerce, and creates a patchwork of standards that threaten to preclude nationwide sales for plant-based meat producers. Yet despite its severely detrimental effects, the Law provides no benefit to Texas consumers; it only benefits Texas's meat producers.

16.     The Law further requires onerous disclosures based on the company making the speech—applying only to plant-based and cultivated meat producers.

17.     The Law is either redundant, or in conflict, with existing federal law. To the extent it requires labeling different from or in addition to that required by the FDCA's standards governing the names of food products, or any regulations promulgated thereunder, it is preempted by the FDCA.

18.     To the extent the Law requires labeling different from or in addition to that required

by the Federal Meat Inspection Act, the Poultry Products Inspection Act, the Egg Products Inspection Act, or any regulations or label approvals promulgated thereunder, it is preempted by federal law.

19.     The Law's language is also unclear and vague. It fails to define key terms necessary to give companies notice of how to comply with the law.

20.     By attempting to impose burdensome roadblocks on a burgeoning industry, the State of Texas has bowed to pressure from cattle industry lobbyists and attempted to tip the scales by favoring one category of food producers over its direct competitor in the marketplace. The growing consumer demand for plant-based alternatives has caused conventional meat producers to increasingly view plant-based meat producers as a threat. Their lobbyists have responded by pressuring legislators and regulators (including in Texas) to undermine the ability of plant-based producers to market their products. Arkansas, for example, recently passed a law to prevent plant-based companies from using words like "meat" to describe their products—an effort that was recently enjoined by a federal court under the First Amendment.

21.     Texas has now added to this patchwork of protectionist state laws. Texas's Law attempts to force plant-based meat producers, including Tofurky and other PBFA members, to make wholesale changes that would prevent them from communicating the nature and contents of their products in a way that complies with federal law, and would cost millions of dollars in packaging changes alone. The Law has already burdened plant-based meat producers and has significantly obstructed their ability to do business in the state. The Law violates the First Amendment, the Supremacy Clause, the Due Process Clause of the Fourteenth Amendment, and the dormant Commerce Clause of the U.S. Constitution. Accordingly, Tofurky and PBFA seek injunctive and declaratory relief to safeguard the right of plant-based meat producers to label products in accordance with federal law without fear of enforcement or reprisal by the State. In

support of their request, Plaintiffs assert the following:

## JURISDICTION AND VENUE

22.     This action arises under the Constitution of the United States and 42 U.S.C.

§ 1983. The jurisdiction of this court is invoked under 28 U.S.C. §§ 1331 and 1343(a).

23.     Venue is proper in this Court under 28 U.S.C. § 1391(b), as a substantial part of the

events or omissions giving rise to the claims in this complaint occurred in Austin, within this judicial

district.

## PARTIES

*Plaintiffs*

24.     Plaintiff Tofurky develops, produces, markets, and sells a popular line of 100%

plant-based meat products including vegan burgers, meat slices, and sausages in various flavors.

Tofurky's products are marketed and sold nationwide, including throughout Texas.

25.     Tofurky is a certified B Corporation, which means that the company is meeting the

highest standards of social and environmental performance, public transparency, and legal

accountability.

26.     Founded in 1980, Tofurky is a mission-based company whose aim is to make great

food everyone can enjoy, and to do it with respect for people, animals, and the planet. Tofurky's

target market is people who want to *avoid* meat made from animals. To that end, its products are all

prominently marketed and packaged as vegan and 100% plant-based, with labels that unmistakably

convey that they are "PLANT-BASED."

27.     Tofurky invests significant resources to ensure its products are labeled in compliance

with applicable state and federal laws across the country. This includes the prevailing law that

governs food companies' labels, the federal Food, Drug and Cosmetic Act. Due to the FDCA's

express preemption provision, which prevents states from passing labeling requirements different

from or in addition to certain FDCA provisions, Tofurky can usually count on the fact that, if its labels comply with the FDCA, they comply with state requirements, too. As a result of this assurance, Tofurky and other companies are able to invest significantly and engage in federally accepted marketing and packaging practices nationwide (as Congress intended in enacting the FDCA).

28.     Plaintiff the Plant Based Foods Association is a nonprofit trade association that represents the leading manufacturers and sellers of 100% plant-based foods, including plant-based meat producers. PBFA is incorporated in the State of California and headquartered in Oakland, California.

29.     PBFA was founded in 2016 to build a strong foundation for the plant-based foods industry to succeed and thrive, and for innovative food companies to have a collective voice in the policy arena and marketplace. PBFA has more than 300 company, affiliate, and investor members who represent the unified voice of the plant-based foods industry. Of its 200+ company-members, at least 92 members manufacture and sell plant-based meat alternatives like veggie burgers, vegan nuggets, and plant-based sausages.

30.     PBFA's goal is to promote clarity and consistency in the labeling of plant-based foods. To that end, PBFA has developed comprehensive voluntary standards for the labeling of plant-based meat alternatives such as plant-based sausages and burgers. PBFA's standards provide guidance to its industry members about how to label plant-based products in a way that is consistent and clear for consumers. PBFA recommends that companies use qualifying language like "vegan," or "plant-based," when they use terms like "sausage," "chicken," "nuggets," or "burger" to indicate to consumers that the products do not contain animal-derived ingredients. To illustrate: "plant-based chicken nuggets" indicates to consumers that the chicken nuggets contain 100% plant-based ingredients and contain no animal-derived ingredients.

31.     Part of PBFA's work has involved communicating with state legislators about the deleterious effects of protectionist and anti-free market labeling laws that are designed to undermine plant-based meat producers.

***Defendants***

32.     Defendant Greg Abbott is the Governor of Texas and as such, has direct authority over executive branch personnel and the officers charged with enforcing the Law.

33.     Defendant Cecile Erwin Young is the Executive Commissioner of the Texas Department of Health and Human Services Commission and is charged with adopting rules necessary to implement the Law.

34.     Defendant Jennifer A. Shuford is the Commissioner of State Health Services and is charged with enforcing the Law and referring violations of the law for prosecution.

35.     Defendant Attorney General Ken Paxton, along with all Texas prosecuting attorneys, are charged with enforcing the Law as it pertains to both plant-based and cell-cultivated meat producers.

## FACTUAL ALLEGATIONS

### *PBFA members, including Tofurky, market clearly labeled plant-based foods.*

36.     All PBFA company-members manufacture or sell one or more 100% plant-based food products. Founded in 2016 by member companies including Tofurky, PBFA has worked tirelessly to ensure its members engage in transparent marketing and labeling practices while facing fair policies and can compete on a level playing field with other food companies, including animal-based meat companies.

37.     Tofurky follows PBFA's voluntary guidelines and is representative of other PBFA members who sell plant-based meat products. To wit, Tofurky prominently markets its products as vegan and plant-based. Tofurky's labels and marketing materials unmistakably convey to the public

9

that the foods are made using exclusively ingredients that do not involve animals, using prominent language like: "Made From Plants," and "plant-based," and "veggie" or "vegetarian."

38.     Tofurky produces its plant-based meats using natural processes and high-quality ingredients that include organic tofu and whole soybeans sourced from organic, non-GMO growers. They are high-quality products that prominently highlight the fact that they are plant-based and typically sell for a higher price-point than animal-based meat counterparts.

39.     Today, Tofurky products are sold in approximately 15,000 stores across the country. Sales are booming—the company grew 22% in the past year—and Tofurky sells at several stores throughout Texas including Target, Walmart, Randalls, Sprouts Farmers Market, Tom Thumb, and Kroger. Tofurky continuously innovates new products.

40.     All of Tofurky's products are clearly marketed and labeled as "plant-based," or "vegan," and no consumer would mistakenly buy these products thinking they were meat from slaughtered animals.

41.     Tofurky products include plant-based chick'n, (including lightly seasoned style, Thai basil, sesame garlic, and barbecue), plant-based deli slices (including smoked ham style, peppered, bologna style, hickory smoked, and oven roasted), plant-based burgers, plant-based artisan sausage (including spinach pesto, andouille, Italian, kielbasa, and beer brats), plant-based crumbles (including chorizo style and beef style), plant-based pockets (including ham and ched'ar, turk'y broccoli ched'ar, and pepp'roni pizza), tempeh (including smoky maple bacon, sesame garlic, organic five grain, and original soy cake), and plant-based roasts (including ham style and roast style).

**Illustration 1: Examples of Tofurky products and marketing**

















42.     Tofurky's business model relies entirely on consumers who are seeking plant-based alternatives being able to clearly distinguish its products from animal-based meat products. Consumers choose Tofurky's products because they are increasingly aware of how their food choices affect the environment, animal welfare, and their own health.[7] And studies show that the vast majority of consumers are often willing to pay more for plant-based meat than animal-based meat.[8] Being plant-based is a feature of these products, not something producers are trying to hide. When consumers buy plant-based meat alternatives, they are not accidentally purchasing cheaper, lower-quality products—quite the opposite. Correspondingly, producers of plant-based meat alternatives do not want their products to be mistaken for animal-based counterparts, lest their products lose their primary appeal—that they are meat options not made from animals.

### Consumers are not confused by plant-based meat products.

43.     Consumers need truthful and non-misleading information about the nature and use of food products they buy in order to make informed purchasing decisions. For decades, plant-based producers have used terms like "vegan sausage," "plant-based bacon," and "veggie burger" to convey to consumers the nature and contents of their products. In the decades that plant-based meats have been in grocery stores, there has been no evidence that consumers are confused by these products. Correspondingly, the FDA has never taken enforcement action for the statements of

---

[7] *See* DSM Food Specialties, *Consumer Insights Report: Plant Power: What's Behind the Market Growth for Plant-based Foods?, available for download at* https://www.dsm.com/content/dam/dsm/food-specialties/en_us/documents/insights-series-plant-power-2019-leaflet.pdf; *see also* Edlong, *Connecting with Consumers in Plant-based Dairy*, Food Dive (Nov. 19, 2019), https://www.fooddive.com/spons/connecting-with-consumers-in-plant-based-dairy/567437/ (last visited Oct. 18, 2021).

[8] Moonshot Collaborative, Plant-Based Shopper Profile, *available at* http://moonshotcollaborative.com/wp-content/uploads/2020/11/Cultivate-PB-Consumer-Profile.pdf (93% of plant-based buyers who are motivated for animal welfare reasons would pay up, with sustainability-related concerns following closely behind at 86% and health reasons at 85%).

identity used by plant-based meat producers.

44.     Instead, the FDA has long-accepted the naming and labeling conventions of plant-based meat products. The FDA has perhaps accepted these statements of identity because these product names provide consumers with the most accurate information about the flavor, consistency, and uses for plant-based meat products. In fact, these naming conventions are so well-understood and established that the FDA itself uses them.[9]

45.     As discussed above, plant-based meat products' sales depend on their ability to differentiate themselves from animal-based meat for consumers who are seeking *alternatives* to animal-based meat. So common sense dictates that plant-based meat producers use marketing and packaging for these products that clearly identify them as *plant-* rather than *animal-*based for consumers. And the way companies currently label plant-based meat products effectively ensures consumers get what they expect when purchasing these foods. In short, companies are trying to avoid misleading consumers, while still using terms that consumers understand to convey the texture, flavor, and function of their plant-based meat products.

46.     In addition, there have been no consumer-led actions brought against plant-based meat producers alleging they have been misled to believe their products contain animal meat. However, courts *have* recognized that similar labeling conventions using qualifying language in addition to animal-based terms like "milk" are not likely to mislead reasonable consumers (*e.g.,* "vegan butter" and "almond milk.").

---

[9] FDA FINAL RULE ADDING SOY LEGHEMOGLOBIN TO LIST OF COLOR ADDITIVES EXEMPT FROM CERTIFICATION (calling ground beef analogue products "veggie burgers"), *available at* https://www.fda.gov/food/cfsan-constituent-updates/fda-announces-effective-date-final-rule-adding-soy-leghemoglobin-list-color-additives-exempt (last visited Aug. 10, 2021); FDA GUIDANCE FOR INDUSTRY: REFERENCE AMOUNTS CUSTOMARILY CONSUMED, Feb. 2018, *available for download at* https://www.fda.gov/media/102587/download (examples of products named by the FDA include "meatless Salisbury steak with gravy," "soy burger," "meatless scallop," "meatless salami," "vegetarian pate," and "vegetarian slices" to name a few).

47.     Federal courts have recognized that the likelihood of these types of names causing any consumer confusion is "highly improbable" and "stretches the bounds of credulity."[10] The Ninth Circuit analyzed naming conventions similar to Tofurky's and found it implausible that consumers would "'believe that veggie bacon contains pork, that flourless chocolate cake contains flour, or that e-books are made out of paper.'"[11]

48.     Moreover, a California district court found that the California Department of Food and Agriculture's attempt to prevent vegan dairy producers from calling products "vegan butter" was unconstitutional,[12] in part because consumers are not confused by these types of product names. In short, several courts have determined that consumers readily understand the current labeling conventions and names of plant-based products.

49.     This sound conclusion has been borne out by empirical studies. An empirical study by Cornell tested consumer reactions to "Plant-Based Deli Slices: Bologna Style," one of the exact naming conventions employed by Tofurky. Results showed that consumers understand that the products do not come from animals. The study also found that plant-based producers' use of "meat" terminology actually *improves* consumer understanding of these types of products.[13]

50.     Tofurky is a founding member of the Plant Based Foods Association, which supports these naming conventions and promotes uniform labeling standards that comply with the FDCA and truthfully convey the nature and contents of plant-based meats to consumers. The

---

[10] *Ang v. Whitewave Foods Co.*, No. 13-CV-1953, 2013 WL 6492353, at *4 (N.D. Cal. Dec. 10, 2013). *See also Gitson v. Trader Joe's Company*, No. 13-cv-011333, 2015 WL 9121232, at *1 (N.D. Cal. Dec. 2, 2015).

[11] *Painter v. Blue Diamond Growers*, No. CV 17-02235, 2017 WL 4766510, at *2 (C.D. Cal. May 24, 2017), *aff'd*, 757 F. App'x 517 (9th Cir. 2018) (rejecting as "implausible" the claim that almond milk was mislabeled under federal law).

[12] *Miyoko's Kitchen v. Ross*, Case No. 20-cv-00893-RS, 2021 WL 4497867 (N.D. Cal. Aug. 10, 2021).

[13] Jareb A. Gleckel, *Are Consumers Really Confused by Plant-Based Food Labels? An Empirical Study*, J. of Animal & Envtl. Law, Vol. 12, No. 2 (Spring 2021).

organization, in conjunction with Linkage Research and Consulting, also worked to examine public comments to the FDA regarding these types of naming conventions when used for plant-based dairy products. In reviewing these comments, PBFA found that 76% of consumers support the current labeling conventions used by plant-based products (with half of the 13.5% of opponents to plant-based dairy naming conventions self-identifying as dairy farmers).[14] Adding to this, because all existing data demonstrate that consumers understand the labels of plant-based meat products, researchers have opined that state-mandated changes to labeling conventions may actually *create* consumer confusion where none previously existed.

51.     Tofurky's labels and marketing materials all clearly indicate its products are meat substitutes that are plant-based and vegan and, thus, are entirely truthful. There is no evidence of consumer confusion about the ingredients or source of any of Tofurky's foods.

52.     The Law attempts to curtail the success of plant-based meat producers, the vast majority of whom are located outside of Texas, and whose activities occur outside of the state. This Law commercially harms the plant-based meat industry—effectively making nationwide sales of plant-based meats impossible—and in turn, protects conventional meat producers from competition.

53.     In other words, the Law confers a clear competitive advantage to in-state animal-based meat producers and creates a competitive disadvantage for plant-based meat producers. The effect of the Law will be that local animal-based meat products will constitute a larger share, and plant-based meats with an out-of-state source will contribute a smaller share, of total sales within Texas.

---

[14] PBFA WEBSITE, MORE THAN 75% OF COMMENTERS TELL FDA: ALLOW PLANT-BASED ALTERNATIVES TO USE DAIRY TERMS, (Apr. 22, 2019) *available at* https://www.plantbasedfoods.org/commenters-tell-fda-allow-plant-based-alternatives-to-use-dairy-terms/ (last visited Oct. 7, 2021)

### *Cultivated meat labeling is regulated by federal law.*

54. There is no evidence that consumers are confused about the labeling of cultivated meat. As cultivated meat is not yet available for sale in grocery stores, there is no data available on how consumers perceive cultivated meat labels.

55. The USDA pre-approves all labels for cultivated meat products under its jurisdiction. USDA label approvals have preemptive effect and supersede any state laws or regulations that require labeling different from or in addition to the preapproved labels.

56. The USDA will publish regulations on the labeling of cultivated meat from livestock, poultry, and catfish.

57. The FDA will oversee the labeling of cultivated seafood products other than catfish, and the FDCA's prohibition against false and misleading labeling will apply to those products.

### *Existing law already prevents actually misleading or deceptive labeling.*

58.     Federal and state laws have long prohibited any misrepresentations in the marketing or labeling of food products.

59.     Plant-based meat labels fall within the federal Food and Drug Administration's jurisdiction under the FDCA. The FDCA categorizes a food product as "misbranded" if "its labeling is false or misleading in any particular." 21 U.S.C. § 343(a)(1). The FDA has not brought any reported enforcement actions for the misleading use of "meat" or related terms to describe plant-based meats on food labels or marketing materials.

60.     In addition, the Federal Trade Commission (FTC) enforces the Federal Trade Commission Act (FTCA). See 15 U.S.C. § 45 (prohibiting "unfair or deceptive acts or practices" in or affecting commerce). The FTCA's prohibition on "unfair or deceptive acts or practices" encompasses food marketing. The FTC, along with the FDA, has concurrent jurisdiction with respect to food products marketed to consumers. But the FTC regulates the marketing and

advertising of food products to prevent consumer confusion and to ensure that products are accurately marketed.

61.    In other words, the FTC already has authority to ensure that plant-based meat products are marketed honestly and that consumers are adequately informed. Yet it has not brought any reported enforcement actions for the use of "meat" or related terms to describe plant-based on food labels or marketing materials.

62.    Texas's own Food, Drug and Cosmetic Act also prohibits "false or misleading" labeling of food products. Tex. Health & Safety Code § 431.082(a).

63.    Similarly, Texas's Consumer Protection Act prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce." Tex. Bus. & Commerce Code § 17.46 *et seq.*

64.    On information and belief, there have been no cases in Texas (or any other state) holding that it is false or misleading to use the word "meat," or related terms, on labels and marketing materials for plant-based meats.

### *The Law is either duplicative of or in contradiction with existing federal law.*

65.    In addition to the FDCA provision prohibiting any false or misleading labeling, plant-based meat producers are also governed by FDCA provisions surrounding the names of products.

66.    The FDCA, as amended by the Nutrition Labeling and Education Act (NLEA), is intended to promote "national uniformity in certain aspects of food labeling, so that the food industry can market its products efficiently in all 50 States in a cost-effective manner."[15]

67.    Because of the importance of ensuring a nationwide uniform labeling scheme,

---

[15] State Petitions Requesting Exemption from Federal Preemption, 58 Fed. Reg. 2462, 2462 (Jan. 6, 1993) (codified at 21 C.F.R. pt. 100).

especially when it comes to the label on the front of a food package, known as the Principal Display

Panel (PDP), Congress built an express preemption provision into the FDCA, in order to preempt

"some state laws that interfered with [companies'] ability to do business in all 50 states."[16] The intent

of Congress was clear: To "provide national uniformity where it is most necessary."[17] And of course

the Supremacy Clause of the Constitution, U.S. const. art VI cl. 2, allows federal law to preempt

state law. A state law is expressly preempted when a congressional statute or federal agency

regulation contains explicit language stating that it supersedes that state law.

68.     The discrete provisions addressed at 21 U.S.C. § 343-1(a) carefully limit the subjects

on which federal standards will preclude enforcement of non-identical state laws, and specifically

include much of the required information and common representations companies make on food

products' PDPs. This includes those requirements governing products' names—or in FDA

parlance—"statements of identity."[18]

69.     Regulations surrounding statements of identity require that the statement of identity,

is included once on the PDP. The FDCA also governs the prominence with which producers must

include statements of identity on products' Principal Display Panels.

70.     Paragraph 3 of the express preemption provision provides that states may not

impose any non-identical "requirement for the labeling of food of the type required by" section

343(i)(1). That provision provides that a food label must bear the common or usual name of the

food, if one exists. Because Tofurky and PBFA member-companies' labels comply with section

343(i)(1) and related regulations, any additional or non-identical state requirements are preempted by

---

[16] 136 Cong. Rec. H12951-02, H12954 (Oct. 26, 1990) (explanation of FDCA's preemption
provision by Representative Waxman).

[17] 136 Cong. Rec. at S16609 (Sen. Mitchell); *see also* 135 Cong. Rec. at S16611 (Sen. Hatch).

[18] 21 U.S.C. § 343-1(a)(3); *see also* 21 C.F.R. § 101.3.

the FDCA. Thus, under the FDCA, a state law governing the "common or usual" product name is expressly preempted.

71.    Texas's Law either requires companies to modify the placement and prominence of FDCA-compliant common or usual names, or requires them to place additional product names, on their PDPs. Because the FDCA expressly lays out the requirements for statements of identity, the Law imposes obligations on companies that are different from, or in addition to, those laid out by the FDCA.

72.    Uniform standards for labeling, including those governing statements of identities, allow plant-based meat companies to do business across state lines without unfair (and likely impossible) impediments. The cost to allow otherwise, both in terms of financial and human resources and harm to budding companies' bottom lines and goodwill, would be astronomical.

### *The conventional dairy and meat industries lobby state and local governments to halt their rapidly growing plant-based competition.*

73.    Tofurky, along with other plant-based meat producers who are members of PBFA, has benefited from rapidly climbing demand for plant-based foods, experiencing unprecedented growth in recent years. Sales of plant-based meat alternatives have reliably grown 11% year after year,[19] and sales in 2020 were up 45% from 2019.[20] Plant-based meat now accounts for 2.7% of all retail packaged meat sales,[21] and industry experts estimate it will rise to $6.43 billion in 2023.[22]

---

[19] *Fresh Meat and Plant-Based Meat Alternatives on the Rise, According to New Acosta Research,* Acosta, https://www.acosta.com/news/fresh-meat-and-plant-based-meat-alternatives-on-the-rise-according-to-new-acosta-research (last visited Oct. 18, 2021).

[20] U.S. plant-based food retail sales jumped 27% in 2020, Supermarket News (Apr. 6, 2021), https://www.supermarketnews.com/consumer-trends/us-plant-based-food-retail-sales-jumped-27-2020 (last visited Oct. 18, 2021).

[21] *Id.*

[22] Michelle Neff, *Plant-Based Meats Are Taking Over With Market Set to Hit $6.43 Billion by 2023!,* One Green Planet, Feb. 6, 2018, http://www.onegreenplanet.org/news/meat-substitute-market-worth-billions/ (last visited Oct. 18, 2021).

Animal meat producers increasingly view competition from plant-based meats as a threat, and apparently see the rising sales of plant-based meat alternatives as linked to the decreased demand for animal-based dairy products.[23] Market research firms have corroborated this shift away from "traditionally harvested" meat products, as well as the meat industry's corresponding anxiety over its subsequent market share.[24]

74.    As a result, some players in the meat industry have vigorously lobbied legislators and government agencies to take action against their plant-based competitors. In February 2018, the United States Cattlemen's Association petitioned the USDA to prevent plant-based meat alternatives and cultivated meat products from using the terms "beef" and "meat."[25] USDA ultimately denied the petition insofar as it related to plant-based meat alternatives, and state-level Cattlemen's Associations began lobbying state legislators.

75.    The Missouri state senator who sponsored the first law restricting alternative meat

---

[23] Chuck Jolley, *Six Greatest Ag Challenges for 2018*, Feedstuffs, Dec. 7, 2017, https://bit.ly/30E4mjX (last visited Oct. 18, 2021); *see also* Nat'l Cattlemen's Beef Ass'n, *2018 Policy Priorities*, https://bit.ly/2LrTPF4 (last visited Oct. 18, 2021).

[24] *E.g.*, Thea Halpin, *Can Plant-Based Meat Be Better than the Real Thing?*, ABC News, June 16, 2016, http://www.abc.net.au/news/2016-06-17/the-rise-and-rise-of-plant-based-food/7508752 (last visited Oct. 18, 2021); *Watch Out . . . or They Will Steal Your Growth! Why Alternative Proteins Are Competing So Successfully for the Centre of the Plate* Rabobank (Nov. 2017) (asserting that plant-based meats are "stealing" growth from meat products); https://research.rabobank.com/far/en/sectors/animal-protein/why-alternative-proteins-are-competing-for-the-centre-of-the-plate.html (last visited Oct. 18, 2021); *see also* Amanda Radke, *Investment in Lab Meat Takes Off*, Beef (Mag.), Aug. 30, 2017, http://www.beefmagazine.com/outlook/investment-lab-meat-takes (last visited Oct. 18, 2021). Meatingplace, a trade publication covering the meat industry, published 18 articles about plant-based meats and clean meat from September to November 2019.

[25] UNITED STATES CATTLEMEN'S ASSOCIATION PETITION TO USDA, No. FSIS-2018-0016, https://www.fsis.usda.gov/wps/wcm/connect/e4749f95-e79a-4ba5-883b-394c8bdc97a3/18-01-Petition-US-Cattlement-Association020918.pdf?MOD=AJPERES.

labeling openly admitted that the bill came from the state's Cattlemen's Association[26]—a "livestock commodity group . . . with a primary mission to promote and protect the beef-producing industry."[27] In response to similar pressures from other state cattlemen's associations, eleven states have passed protectionist measures to prevent producers of plant-based and cultivated meat from using words like "meat," "beef," "sausage," and "roast" to describe plant-based products. Several states, including Missouri[28] and Oklahoma, have imposed additional disclaimer language on plant-based meat products' PDPs that differ from Texas's Law.

76.     In Oklahoma, the fifth largest producer of cattle in the United States (as well as the tenth for pig production),[29] the state Cattlemen's Association also took responsibility for the Act,[30] expressly saying that the Association brought the bill to the Oklahoma legislature.[31] When the Act passed, the Cattlemen's Association thanked its partners at the Oklahoma Pork Council.[32]

77.     The lawmakers who sponsored the Act were members of the Oklahoma Cattlemen's Association and stood to gain from the Act—being beef producers themselves.[33] Clearly proud of

---

[26] Sara Brown, *How Missouri Began to Tackle Fake Meat: Missouri Sen. Sandy Crawford*, Drovers (May 31, 2018), https://www.drovers.com/article/how-missouri-began-tackle-fake-meat-missouri-sen-sandy-crawford (noting that beef cattle represent $2 billion of an $88 billion agriculture industry in Missouri, she added: "That's just the cattle themselves . . . so it is huge for the state of Missouri.").

[27] Missouri Cattlemen's Ass'n, About Us, https://www.mocattle.org/about-us (last visited Nov. 30, 2019).

[28] Via an enforcement memorandum by the Missouri Department of Food & Agriculture, *available at* https://agriculture.mo.gov/animals/pdf/missouri-meat-advertising-guidance.pdf

[29] Beef2Live, Oklahoma Ag Facts, https://beef2live.com/story-oklahoma-ag-facts-116-105007 (last visited July 17, 2021).

[30] Morning AgClips, *Governor Signs Oklahoma Meat Consumer Protection Act*, (May 19, 2020), https://www.morningagclips.com/governor-signs-oklahoma-meat-consumer-protection-act/ (last visited Oct. 1, 2021).

[31] *Id.*

[32] *Id.*

[33] *Id.*

protecting animal-based meat producers from the growing competition posed by plant-based meat producers, these lawmakers publicly acknowledged that they are "always willing to help our beef producers . . .,"[34] candidly admitting the true protectionist nature of the Act.

78.    Similar to Oklahoma, the Texas law cites consumer confusion and concerns about truthful labeling as its motivation—yet it was backed by the Texas Farm Bureau and the Texas Cattle Feeders Association,[35] and follows a dearth of consumer complaints or any evidence of confusion at all. Texas is the top cattle producer in the nation.

79.    Despite paying lip service to concerns about consumer confusion, it is clear that the State's purported interests are not the actual interests served by the Law. Instead, lawmakers passed the Law to benefit in-state interests by burdening their out-of-state plant-based counterparts.

80.    While some similar laws have been struck down as unconstitutional restrictions on truthful commercial speech,[36] other states are in the process of passing laws that likewise undermine plant-based meat producers' ability to market and package their products nationwide.

81.    While Texas's Law is unclear in terms of what conduct it applies to and what it actually requires, what is clear is that it was passed to favor Texas animal-based meat producers over alternative meat producers from other states.

82.    And like the laws at issue in other states, Texas's Law would require Tofurky and other PBFA members to create new labeling nationwide. Given the nature of food retail and

---

[34] *Id.*

[35] https://texasfarmbureau.org/advocacy/priority-issues/; https://texasfarmbureau.org/meat-labels-subject-of-truth-in-labeling-bill/

[36] A federal district court in Arkansas determined that challenged provisions of Arkansas Code Annotated § 2-1-305(2) unconstitutionally restricted Tofurky's speech because the provisions did not "advance the stated governmental interest of protecting consumers from being misled or confused" and were likely more extensive than necessary to achieve that stated goal. *Turtle Island Foods SPC v. Soman*, 632 F.Supp.3d 909, 937 (E.D. Ark. 2022).

distribution agreements, companies have no control over which of their products end up in which states. Thus, to comply with Texas's law, companies need to change *all* of their labels to ensure that any products that end up in Texas comply with the Law. Companies also cannot control which citizens in which states view their labels on websites or purchase their products online. The Law's restrictions thus reach national labeling (including online communications) that cannot lawfully be regulated by a single state. As it was designed, the Law tilts the playing field markedly in favor of in-state animal-based meat producers and against out-of-state plant-based meat competitors.

### *Texas's Law burdens plant-based meat producers, the free flow of commerce, and impermissibly regulates interstate commerce and extraterritorial conduct.*

83.     Legislators passed the challenged Law citing a need to ensure consumers are not confused by plant-based meat products. Yet there is no evidence consumers need protection, and no support for the State's contention that plant-based meats are misleadingly marketed or labeled. Instead, there is ample evidence that lawmakers passed this Law at the behest of animal agriculture special interests.

84.     The alleged consumer confusion cited by Texas legislators—that one out of every five Texans who had purchased a plant-based product feel misled by the labels and thought such products contained real meat—was funded by an industry trade group (the Texas Cattle Feeders Association). The survey itself, along with raw data or specific questions asked, have not been disclosed to the public. It is unclear whether such data were disclosed to the legislators who passed the Law.

85.     The Law attempts to impose a significant, burdensome, and—given current legislative efforts across numerous states—impracticable disclosure requirement on plant-based meat products' principal display panels.

86.     In doing so, the Law violates the principles of uniform commercial regulation and

economic efficiency that are reflected by the dormant Commerce Clause, which prohibits state laws that discriminate against interstate commerce on their face; that harbor a discriminatory purpose; that discriminate in their effect; or that impose a burden on interstate commerce that is clearly excessive in relation to the putative local benefits.

87.    Laws are discriminatory in their effect when they confer a clear competitive advantage to certain in-state companies and create a comparative disadvantage for out of state companies. Here, the effects of the Law fall disproportionately on out-of-state food manufacturers; the vast majority of plant-based and cultivated meat producers are located outside Texas. As a result, the cost of implementing the Law falls largely, if not entirely, on out-of-state companies, and the Law affects marketing and labeling actions that occur exclusively outside of Texas.

88.    There is no evidence of any local benefit because there is no evidence of any consumer confusion. Yet the burden on Tofurky and PBFA member companies is astronomical.

### Compliance with the Law is impossible because of its vague terms.

89.    The language of the Law is unclear as to what "name of the product" means. The language of the Law is vague as to where producers must display the required disclosure.[37] And federal law already governs the name of the product, or "statement of identity."

### Effect of the Law on PBFA, Tofurky, plant-based meat producers, and PBFA members.

90.    The PBFA represents many plant-based meat companies that have products sold in Texas. And part of PBFA's express mission is creating a "fair and modern regulatory environment."[38] PBFA's members, like Tofurky, are directly and financially harmed by the Law, and PBFA's organizational objectives and mission to establish a level playing field for plant-based

---

[37] TEX. HEALTH & SAFETY CODE 431.082(d-1)

[38] Plant Based Foods Association, Company Membership, https://www.plantbasedfoods.org/join-us/company/ (last visited Oct. 1, 2021).

producers are frustrated by the Law, which is why PBFA took steps to combat the Law's passage.

91.     Attempting to comply with the Law would hobble Tofurky and other plant-based meat companies represented by PBFA. The changes seemingly required by the Law would simultaneously (1) cost the company millions of dollars to change labels and marketing representations, (2) prevent the company from accurately communicating to consumers the nature and contents of its products—what the products taste like, what they're made from, what they do and do not contain, and how to use them, and also (3) prevent companies from selling and distributing plant-based meat products nationwide—regardless of whether they even intend for them to be sold to Texas consumers.

92.     Absent injunctive and declaratory relief, the Law will continue to burden interstate commerce, threaten companies' ability to deliver their core mission and products to the citizens of Texas, chill companies' protected speech, cause untold harm to their business, and expose them to a substantial risk of prosecution. The Law is specifically designed to and will significantly disadvantage plant-based meat producers and PBFA. The Law impedes plant-based and cultivated meat producers' ability to engage in interstate commerce in an effort to protect the economic interests of Texas's animal-based meat producers.

93.     Labels for Tofurky's products always include modifiers like "vegan," and "plant-based" that clearly indicate that the products do not contain meat from animals. But because it is unclear whether Texas's Law requires additional or more prominent disclosures, Tofurky reasonably fears prosecution by the State of Texas.

94.     The Law, if left undisturbed, would also force companies like Tofurky to consider creating one set of labels for Texas and another set for other states, which would raise the cost to come to market. And even if Tofurky did so, they could not guarantee that products with non-Texas labels do not end up in Texas. Compliance with the Law would therefore have a severe detrimental

impact on Tofurky's nationwide marketing and packaging of its products.

95.     Since 1980, Tofurky has invested significant time and expense in developing its products and marketing and packaging those products in truthful and non-deceptive ways. Yet, because of the Law, Tofurky must now either: (1) choose to continue to have its products sold in Texas as packaged, at a substantial risk of prosecution; (2) design, produce, and distribute different, specialized marketing and packaging for its products when they will be sold in Texas, creating a logistical nightmare and continuing to risk prosecution given its lack of control over distribution channels, or (3) change the entirety of its marketing and packaging nationwide because of the Law, at considerable expense, and causing confusion to its consumers. The third and last option may not even be possible if other states pass laws with labeling provisions contradictory to those in the Texas Law. Further, changing labels in an attempt to comply with the Law may force Tofurky to sacrifice invaluable front-of-package space, or constrain the ways in which Tofurky conveys to consumers the nature and contents of its products. And even if Tofurky chooses this option, it would be impossible to change labels nationwide before September 1, 2023.

96.     Each of these options would put Tofurky at a significant commercial disadvantage for no legitimate reason. Tofurky already labels its product in a manner that complies with federal law and existing Texas laws, and that consumers understand.

97.     As a result of the Law, Tofurky is likely to experience other serious harms. For example, retail chains that operate in Texas and other states may be less likely to carry plant-based meat products, including those produced and sold by Tofurky, if they cannot do so in the same manner in all their stores. Tofurky also risks liability for selling its products online on platforms that ship to Texas consumers. And compliance with the Law could create bad will for Tofurky—as customers become frustrated with the unavailability of plant-based meat products in Texas.

98.     These serious harms—in conjunction with the added expense that the Law seeks to

impose by forcing Tofurky to specifically tailor its product labels for distribution in Texas—demonstrate that the burden on interstate commerce is unjustifiably excessive when weighed against the Law's illusory, unproven need to prevent alleged consumer confusion.

99.    Finally, complying with Texas's Law may prevent Tofurky and other plant-based meat producers from being able to comply with federal law. And if Texas and other states are allowed to promulgate differing front-of-package standards, it may become not just impracticable but impossible for plant-based meat companies to comply with the patchwork of new state labeling laws. In short—Texas's Law, along with other states' new laws, may prevent these companies from doing business at all.

100.    Notably, neither the FDA, the FTC, the Texas state Attorney General's office, or any consumer groups have ever opted to take action against a plant-based meat product out of concern that consumers might think it contains animal-based meat.

101.    The obvious inconsistencies—between the State's justification for the Law, on the one hand, and the text, purpose, and past enforcement history of the cited state and federal laws and regulations, on the other hand—strongly suggest that the Law is motivated by a desire to favor Texas animal-based meat producers over alternative meat producers from other states rather than by a good-faith effort to enforce existing law or prevent actual consumer confusion.

## CLAIMS FOR RELIEF

### Count One
### (Preemption under federal law)

102.    Plaintiffs incorporate by reference the allegations made in the preceding paragraphs as if each were fully set forth herein.

103.    The federal Food, Drug and Cosmetic Act expressly preempts the Law's disclosure requirements. The Law imposes disclosure requirements as a part of products' names that are

different from, or in addition to, federal regulations governing statements of identity.

104.    The Law frustrates Congress's intent to create a uniform labeling scheme so that the food industry can market and label products efficiently in all 50 States in a cost-effective manner.

105.    Instead, the Law would create and contribute to a patchwork of separate and potentially conflicting labeling requirements for plant-based meat products from different states and impairs plant-based meat producers' ability to comply with state and federal labeling requirements.

106.    In short, the Law conflicts with, is expressly preempted by, and otherwise impedes the accomplishment and execution of the full purposes and objectives of federal law.

**Count Two**
**Violation of the Supremacy Clause**

107.    Plaintiffs incorporate by reference the allegations made in the preceding paragraphs as if each were fully set forth herein.

108.    The Law represents an impermissible effort by Texas to establish its own food labeling scheme and to directly regulate the labeling of plant-based meat products. In particular, the Law conflicts with and is expressly preempted by certain provisions of the federal Food, Drug and Cosmetic Act. It impedes the accomplishment and execution of the full purposes and objectives of federal law. As such, the Law violates the Supremacy Clause and is invalid.

**Count Three**
**Discrimination in violation of the dormant Commerce Clause**
**42 U.S.C. § 1983**

109.    Plaintiffs incorporate by reference the allegations made in the preceding paragraphs as if each were fully set forth herein.

110.    The Law violates the Commerce Clause of the United States Constitution by discriminating against out-of-state producers of meat products.

111.    The Law violates the Commerce Clause because its purpose and effect are to protect

30

in-state Texas animal-based meat producers from out-of-state competitors who produce plant-based and cultivated meat.

112.   The Law's disclosure requirement confers a benefit on in-state meat producers by requiring burdensome and expensive disclosure requirements and necessary changes to marketing and labeling that are only imposed on plant-based and cultivated meat producers, the vast majority of which are outside of Texas.

113.   The intended and inevitable effect of the Law is to protect in-state meat producers either by preventing plant-based meat producers from selling products within Texas or accepting burdensome and costly Texas-specific disclosures and subsequent marketing and labeling changes.

114.   The Law operates as an impermissible protectionist trade barrier, blocking the flow of goods in interstate commerce unless out-of-state producers comply with the requirements set forth by the Law. The Law's disclosure requirement imposes significant burdens on, and interferes with the conduct of interstate commerce, including for Tofurky and PBFA's numerous member companies who produce plant-based meat products.

115.   Texas's Law is further discriminatory because it tilts the playing field and consumer access to meat products markedly in favor of in-state meat producers.

116.   The Law violates the dormant Commerce Clause because the State cannot carry its burden of demonstrating, under rigorous scrutiny, that it has no other means to advance a legitimate local interest. Further, Texas has no legitimate local interest in protecting consumers from being confused by plant-based meat products' marketing and labeling because consumers are not confused by current practices. No non-biased, empirical evidence exists to support a presumption that consumers are confused by the marketing and labeling of plant-based meat products, let alone evidence of a link between additional or different disclosure requirements and the prevention of consumer confusion.

31

117.    Moreover, there are already federal regulations in place to ensure product names are truthful and not misleading and that consumers are not confused by products' front-of-package labeling. The FDCA requires plant-based meat producers, and all producers of foods regulated by the FDA, to include statements of identity in certain place and prominence on products' Principal Display Panels. As stated above, the FDCA establishes a uniform regulatory scheme for certain aspects of food labeling. This federal law already fully addresses any concerns the state of Texas might have at preventing labeling practices that encourage consumer confusion.

**Count Four**
**Excessive Burden in Violation of the dormant Commerce Clause**
**42 U.S.C. § 1983**

118.    Plaintiffs incorporate by reference the allegations made in the preceding paragraphs as if each were fully set forth herein.

119.    The Law violates the dormant Commerce Clause by imposing unreasonable burdens on interstate and foreign commerce that are clearly excessive in relation to any legitimate local benefits.

120.    The Law substantially burdens the interstate and international sale of plant-based meat products. Compliance with the Law would require extensive and costly changes to plant-based meat products' marketing and labeling practices.

121.    PBFA's members, including Tofurky and other plant-based meat producers, will be required to make significant changes to their marketing and packaging in order to attempt to comply with the Law—at great cost. The Law will cost the plant-based meat industry millions of dollars in changed marketing and packaging alone and may cost even more in terms of lost market access and decreased sales. What's more, the Law may cause selling plant-based meat products to become cost-prohibitive nationwide and may prevent fledgling companies from reaching financial solvency.

122.    If companies like Tofurky and other PBFA members were able to comply with the

Law, they would likely need to increase the cost of their products—passing the cost on to consumers and limiting consumer access and choice. If companies choose not to comply with the law, they will lose access to the Texas market and consumers will not be able to purchase plant-based meats within the state.

123.     In short, the Law presents out-of-state producers with a host of unpalatable choices: (1) choose to continue to have products sold in the State of Texas as packaged, at substantial risk of ruinous liability; (2) design, produce, and distribute different, specialized marketing and packaging for products destined for Texas, creating a logistical nightmare in distribution channels that service neighboring states or with online retailers that reach Texas consumers; (3) change the entirety of their marketing and packaging nationwide to comply with the Law, at considerable expense; or (4) refrain from marketing or selling products in Texas at all, including in non-Texas media markets and on online sales platforms that may reach Texas consumers, which may be practically impossible given the nature of food distribution in the United States. Regardless of the choice made by Tofurky and other plant-based meat producers, it seems that the practical result of the Law will be fewer plant-based meat companies providing products to fewer consumers, at higher prices. As a Law designed by and passed at the behest of Texas's animal-based meat producers, this is likely the Law's true purpose.

124.     The burdens imposed by the Law clearly exceed any legitimate local benefit; the Law cannot be justified by any valid consumer protection purpose. And State has no legitimate local interest in regulating the marketing and labeling of products sold in other states, or in preventing Texas consumers from buying imported products that are produced and labeled in ways that Texas disfavors.

**Count Five**
**Violation of Fourteenth Amendment Due Process Clause**
**42 U.S.C. § 1983**

125.     Plaintiffs incorporate by reference the allegations made in the preceding paragraphs as if each were fully set forth herein.

126.     The Fourteenth Amendment's Due Process Clause prohibits statutes that are unconstitutionally vague.

127.     Both on its face and as applied to Tofurky and PBFA's members, the Law is unconstitutionally vague. For example, it is unclear whether the Law requires a second product name in addition to a product's statement of identity. It is also unclear whether the FDA's prominence requirements for standards of identity are sufficient, or if characterizing ingredients are sufficient qualifiers under the Law (*e.g.*, "tempeh bacon"). It is also unclear what is meant by the "product name"—if it is the same or distinct from a product's common or usual name, or "statement of identity." The law also fails to specify what exactly constitutes the "surrounding type" by which the size of the disclosure is measured. And the law does not make clear whether the product's statement of identity can be larger than the required qualifying language, so long as the qualifying language is the same size or larger as *other* nearby text.

128.     The Law fails to provide persons of ordinary intelligence a reasonable opportunity to understand when or how their product labels violate the Law.

129.     The vagueness inherent in the Law's terms authorizes or encourages arbitrary and discriminatory enforcement.

**Count Six**
**Violation of the First Amendment**
**42 U.S.C. § 1983**

130.     Plaintiffs incorporate by reference the allegations made in the preceding paragraphs as if each were fully set forth herein.

34

131.     Plaintiffs have the right, under the First Amendment of the United States Constitution, to engage in truthful speech and to control the content of that speech.

132.     The law is a content-based regulation of speech.

133.     It prescribes two distinct sets of rules: one set for food producers who make plant-based or cultivated meat, and one for food producers who make anything else, including conventional animal meat.

134.     The law favors one class of speakers—producers of animal-based meat—and disfavors another—producers of plant-based or cultivated meat. The law purposefully targets the latter for disfavored treatment.

135.     Further, the Law imposes disclosures that would unreasonably burden plant-based meat producers. The required disclosures would be so cumbersome that they would effectively rule out speech or even prevent producers from participating in the marketplace.

136.     There is no substantial state interest to support this speech regulation and the restrictions and requirements in the Law go far beyond what would be necessary to protect any purported state interest in preventing consumer deception.

137.     There is no reason remedies other than the speaker-based rules found in the Law would be inadequate to directly achieve the State's purported interest.

**Count Seven**
**Declaratory Judgment**
**28 U.S.C. § 2201**

138.     Plaintiffs incorporate by reference the allegations made in the preceding paragraphs as if each were fully set forth herein.

139.     This Court has the power to issue a declaratory judgment in a case of actual controversy within its jurisdiction.

140.     Plaintiffs have presented a case of actual controversy.

35

141.     Should this Court determine that the Law does not prohibit Tofurky's labels or those of other plant-based meat producers, because their conduct is compliant under the Law, Plaintiffs respectfully request a judgment declaring as much.

142.     Should this Court determine that the Law does not require disclosures different from or in addition to the FDCA, Plaintiffs respectfully request a judgment declaring as much.

143.     Should this Court determine that the Law requires disclaimers in the same size and prominence as the name of the product, Plaintiffs respectfully request a judgment declaring as much, and declaring that the name of the product is synonymous with "statement of identity" under the FDCA.

144.     Should this Court determine that the Law does not apply to marketing or advertising materials, Plaintiffs respectfully request a judgment declaring as much.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

A.     Declare the Law unconstitutional, both on its face and as applied to Tofurky and PBFA's members;

B.     Upon motion, grant preliminary injunctive relief preventing the enforcement of the Law, both on its face and as applied to Tofurky and PBFA's members;

C.     Grant a permanent injunction preventing the enforcement of the Law, both on its face and as applied to Tofurky and PBFA's members;

D.     In the alternative, enter declaratory judgment;

E.     Award costs and attorneys' fees under 42 U.S.C. § 1988; and

F.     Grant any other relief that the Court deems just and proper.

Respectfully submitted,

/s/ Michael Swistara

Amanda Howell Bar No. 24078695
Michael Swistara (admitted *pro hac vice*)
ANIMAL LEGAL DEFENSE FUND
525 East Cotati Avenue
Cotati, CA 94931
(707) 795-2533
ahowell@aldf.org
mswistara@aldf.org

Martin Woodward
Scott Kitner
KITNER WOODWARD PLLC
13101 Preston Road, Suite 110
Dallas, TX 75240
(214) 443-4300
martin@kitnerwoodward.com
scott@kitnerwoodward.com

Madeline Cohen (admitted *pro hac vice*)
THE GOOD FOOD INSTITUTE
1120 Connecticut Ave. NW, Suite 1080
Washington, DC 20036
madelinec@gfi.org
(914) 475-0377

Tarak Anada Bar No. 24090576
JONES WALKER, LLP
811 Main Street, Suite 2900
Houston, Texas 77002
Telephone:  504.582.8322
Facsimile:  504.589.8322
E-Mail: tanada@joneswalker.com

**ATTORNEYS FOR PLAINTIFFS**