**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

PLANT BASED FOODS ASSOCIATION, and
TURTLE ISLAND FOODS INC.,

     *Plaintiffs,*

v.

JENNIFER SHUFORD, *in her official capacity as
Commissioner of State Health Services, et al.*

     *Defendants.*

Case No. 1:23-cv-01032

**PLAINTIFFS' COMBINED BRIEF IN OPPOSITION TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................. ii

TABLE OF AUTHORITIES ......................................................................................................... iv

INTRODUCTION ......................................................................................................................... 1

LEGAL STANDARD ................................................................................................................... 2

ARGUMENT ................................................................................................................................ 2

I.    Plaintiffs Have Article III Standing. .................................................................................. 2

    A.    Plaintiffs have sufficiently demonstrated an injury-in-fact under Driehaus. ........................ 2

    B.    Plaintiffs have sufficiently demonstrated an injury-in-fact in the expense and
        trouble of complying with Texas' unlawful statute. ........................................................... 5

    C.    Plaintiffs' injuries are traceable to Defendants. ................................................................. 7

    D.    Plaintiffs' injuries would be redressed by the requested remedy. .......................................... 8

    E.    PBFA has associational standing. ...................................................................................... 8

II.   The Law Violates the First Amendment ............................................................................. 9

    A.    Plaintiffs' speech is entitled to First Amendment protection. ............................................... 9

        1.    Plaintiffs' speech is not misleading. .......................................................................... 9

        2.    Plaintiffs' speech does not concern unlawful non-speech activity .................................. 11

    B.    Defendants have failed to prove that the Law is a permissible restriction on
        commercial speech. ......................................................................................................... 13

        1.    Defendants have not demonstrated that the Law's restrictions directly advance any
            substantial government interest. .............................................................................. 13

        2.    Defendants have failed to demonstrate that the Law is not more restrictive than
            necessary to accomplish the state's purported purpose. ............................................... 16

    C.    The Act violates the First Amendment under any legal standard. ....................................... 18

III.  The Law is Unconstitutionally Vague on its Face and as Applied. .................................... 18

    A.    The Law fails to provide people of ordinary intelligence a reasonable opportunity
        to understand what conduct is prohibited. ....................................................................... 19

B.    The Law is so indefinite that it encourages arbitrary and discriminatory enforcement. ..........................................................................................................23

IV.    The Law is expressly preempted by the FDCA. ...........................................................24

A.    Congress created the FDCA's express preemption provision to ensure a uniform nationwide labeling scheme. .....................................................................24

B.    FDCA's express preemption provision governs a product's common or usual name. ....................................................................................................................26

C.    Defendants repeatedly acknowledge the Law imposes requirements different from and in addition to those imposed by the FDCA. ...............................27

1.    The Law imposes requirements in addition to the FDCA. .......................27

2.    The FDCA allows significant flexibility regarding a product's common or usual name and it does not require that any specific qualifiers be attached to a trade name, brand name, or product name. ...........................................................................................28

3.    The Law's prominence requirements are additional to the FDCA's prominence requirements .........................................................................29

V.    The Law Violates the Dormant Commerce Clause. ......................................................29

A.    The Law discriminates against interstate commerce in purpose and effect. ......................30

1.    The Law purposefully discriminates against the interstate market for plant-based meat to benefit in-state meat and poultry producers. ...................................................................................................30

2.    The Law has the effect of discriminating against out-of-state plant-based meat producers and benefiting in-state meat and poultry producers. ...................................34

3.    The Law is not the only means to advance a legitimate state interest. ...............................35

B.    The Law violates the *Pike* balancing test by gravely burdening interstate commerce in clear excess of any putative legitimate local interest. .................................36

1.    The Law gravely burdens interstate commerce. .....................................37

C.    The Law does not serve a legitimate local interest. ................................................39

**CONCLUSION** .......................................................................................................................**40**

**CERTIFICATE OF SERVICE** ................................................................................................**2**

## TABLE OF AUTHORITIES

**Cases**

*44 Liquormart, Inc. v. Rhode Island,*
  517 U.S. 484 (1996) ................................................................................................................... 9

*Allstate Ins. Co v. Abbott,*
  495 F.3d 151 (5th Cir. 2007) ................................................................................. 29, 30, 35, 37

*Am. Beverage Ass'n v. City & Cnty. of San Francisco,*
  916 F.3d 749 (9th Cir. 2019) ................................................................................................. 18

*Ang v. Whitewave Foods Co.,*
  No. 13-CV-1953, 2013 WL 6492353
  (N.D. Cal. Dec. 10, 2013) ...................................................................................................... 11

*Ass'n of Am. Physicians & Surgeons, Inc. v. Texas Med. Bd.,*
  627 F.3d 547 (5th Cir. 2010) ................................................................................................... 8

*Babbitt v. United Farm Workers Nat'l Union,*
  442 U.S. 289 (1979) ................................................................................................................... 3

*Bacchus Imports, Ltd. v. Dias,*
  468 U.S. 263 (1984) ................................................................................................................. 29

*Barilla v. City of Houston,*
  13 F.4th 427 (5th Cir. 2021) .................................................................................................... 3

*Blum v. Holder,*
  744 F.3d 790 (1st Cir. 2014) .................................................................................................... 5

*Bolger v. Youngs Drug Products Corp.,*
  463 U.S. 60 (1983) ..................................................................................................................... 9

*Bryd v. Tenn. Wine & Spirits Retailers Ass'n,*
  883 F.3d 608 (6th Cir. 2018) ................................................................................................. 36

*C&A Carbone, Inc. v. Town of Clarkstown, N.Y.,*
  511 U.S. 383 (1994) .......................................................................................................... 29, 36

*Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.,* 520 U.S. 564 (1997) ....................... 35

*Career Coll. & Schs. of Tex. v. U.S. Dep't of Educ.,*
  98 F.4th 220 (5th Cir. 2024) ................................................................................................. 5, 6

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) ........................................................................................................ 2, 14, 15

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York,*
  447 U.S. 557 (1980) ..................................................................................... 9, 11, 13

*Chem. Waste Mgmt., Inc. v. Hunt,*
  504 U.S. 334 (1992) ..................................................................................... 35

*Churchill Downs Inc. v. Trout,*
  589 Fed. Appx. 233 (5th Cir. 2014) ............................................................ 35

*Connally v. Gen. Const. Co.,*
  269 U.S. 385 (1926) ..................................................................................... 21

*Dep't of Revenue v. Davis,*
  553 U.S. 328 (2008) ..................................................................................... 34

*Edenfield v. Fane,*
  507 U.S. 761 (1993) ..................................................................................... 9, 13, 14

*Express Oil Change, L.L.C. v. Mississippi Bd. of Licensure for Pro. Eng'rs & Surveyors,*
  916 F.3d 483 (5th Cir. 2019) ....................................................................... 10

*Farm Raised Salmon Cases,*
  175 P.3d 1170 (Cal. 2008) ........................................................................... 27

*FCC v. Fox Television Stations, Inc.,*
  567 U.S. 239 (2012) ..................................................................................... 19

*Fla. Bar v. Went For It, Inc.,*
  515 U.S. 618 (1995) ..................................................................................... 15, 16

*Ford Motor Co. v. Tex. Dep't of Transp.,*
  264 F.3d 493 (5th Cir. 2001) ....................................................................... 11, 12

*Ford Motor Co. v. Texas Dep't of Transp.,*
  264 F.3d 493 (5th Cir. 2001) ....................................................................... 30

*Free Speech Coal., Inc. v. Paxton,*
  95 F.4th 263 (5th Cir.) ................................................................................. 15

*Freeman v. Corzine,*
  629 F.3d 146 (3d Cir. 2010) ......................................................................... 35

*Gentile v. State Bar,*
  501 U.S. 1030 (1991) ................................................................................... 23

*Giboney v. Empire Storage & Ice Co.,*
  336 U.S. 490 (1949) ..................................................................................... 12

*Gitson v. Clover Stornetta Farms,*
   No. C-13-01517(EDL), 2014 WL 2638203
   (N.D. Cal. June 9, 2014) ....................................................................................................25

*Gitson v. Trader Joe's Co.,*
   No. 13-CV-01333-VC, 2015 WL 9121232
   (N.D. Cal. Dec. 1, 2015) ...................................................................................................11

*Granholm v. Heald,*
   544 U.S. 460 (2005) .........................................................................................................36

*Hignell-Stark v. City of New Orleans,*
   46 F.4th 317 (5th Cir. 2022) ...........................................................................................34

*Hi-Tech Pharms., Inc. v. HBS Int'l Corp.,*
   910 F.3d 1186 (11th Cir. 2018) .......................................................................................27

*Hobby Distillers Ass'n v. Alcohol & Tobacco Tax & Trade Bureau,*
   740 F.Supp.3d 509 (N.D. Tex. 2024) ...............................................................................3

*Hughes v. Oklahoma,*
   441 U.S. 322 (1979) .........................................................................................................35

*In re: Whole Foods Mkt., Inc.,*
   163 F.Supp.3d 385 (W.D. Tex. 2016) .............................................................................27

*Isaacson v. Brnovich,*
   610 F.Supp.3d 1243 (D. Ariz. 2022) ...............................................................................23

*Kassel v. Consolidated Freightways Corp. of Del.,*
   450 U.S. 662 (1981) .........................................................................................................30

*Kolender v. Lawson,*
   461 U.S. 352 (1983) .........................................................................................................23

*La Unión del Pueblo Entero v. Abbott,*
   618 F.Supp.3d 504 (W.D. Tex. 2022) ...............................................................................8

*La Unión del Pueblo Entero,*
   751 F.Supp.3d (W.D. Tex. 2024) ...............................................................................22, 23

*Lewis v. BT Inv. Managers, Inc.,*
   447 U.S. 27 (1980) ...........................................................................................................31

*Lorillard Tobacco Co. v. Reilly,*
   533 U.S. 525 (2001) .........................................................................................................16

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ...........................................................................................................3

*Malacara v. Garber,*
  353 F.3d 393 (5th Cir. 2003) ........................................................................2

*McClelland v. Katy Indep. Sch. Dist.,*
  63 F.4th 996 (5th Cir. 2023) .......................................................................19

*Miyoko's Kitchen v. Ross,*
  Case No. 20-cv-00893-RS, 2021 WL 4497867
  (N.D. Cal. Aug. 10, 2021) ...........................................................................11

*N.H. Right to Life PAC v. Gardner,*
  99 F.3d 8 (1st Cir. 1996) .......................................................................... 4, 5

*Nat'l Council for Improved Health v. Shalala,*
  122 F.3d 878 (10th Cir. 1997) ....................................................................28

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra,*
  585 U.S. 755 (2018) ....................................................................................18

*Nat'l Pork Producers Council v. Ross,*
  143 S. Ct. 1142 (2023) ................................................................................37

*Navegar v. United States,*
  103 F.3d 994 (D.C. Cir. 1997) .....................................................................5

*NetChoice, L.L.C. v. Fitch,*
  134 F.4th 799 (5th Cir. 2025) ......................................................................8

*NextEra Energy Capital Holdings, Inc. v. Jackson,*
  756 F.Supp.3d 428 (W.D. Tex. 2024) .............................................. 3, 35, 36

*NextEra Energy Capital Holdings, Inc. v. Lake,*
  48 F.4th 306 (5th Cir. 2022) ............................................................29, 30, 31

*Ohralik v. Ohio State Bar Ass'n,*
  436 U.S. 447 (1978) ....................................................................................12

*Or. Waste Sys., Inc. v. Dept. of Envtl. Quality of State of Or.,*
  511 U.S. 93 (1994) ......................................................................................33

*Painter v. Blue Diamond Growers,*
  No. CV 17-02235, 2017 WL 4766510
  (C.D. Cal. May 24, 2017) ............................................................................10

*Perea v. Walgreen Co.,*
  939 F.Supp.2d 1026 (C.D. Cal. 2013) .........................................................26

*Pike v. Bruce Church, Inc.,*
  397 U.S. 137 (1970) ............................................................................... 30, 37

*Poe v. Ullman,*
   367 U.S. 497 (1961) .................................................................................5

*Prestage Farms, Inc. v. Bd. of Supervisors of Noxubee Cty.,*
   205 F.3d 265 (5th Cir. 2000) ...............................................................7

*Regan v. Sioux Honey,*
   921 F.Supp.2d 938 (E.D. Wis. 2013) ................................................28

*Rest. L. Ctr. v. U.S. Dep't of Labor,*
   66 F.4th 593 (5th Cir. 2023) ................................................................6

*Roark & Hardee LP v. City of Austin,*
   522 F.3d 533 (5th Cir. 2008) .............................................................19

*Samet v. Procter & Gamble Co.,*
   No. 5:12-CV-01891 PSG, 2013 WL 3124647
   (N.D. Cal. June 18, 2013) ..................................................................26

*See Johnson v. United States,*
   576 U.S. 591 (2015) .............................................................................19

*See TelTech Systems, Inc. v. Barbour,*
   866 F.Supp.2d 571 (S.D. Miss. 2011) ..............................................39

*Speech First, Inc. v. Fenves,*
   979 F.3d 319 (5th Cir. 2020) ..........................................................4, 5

*Steffel v. Thompson,*
   415 U.S. 452 (1974) ...............................................................................5

*Susan B. Anthony List v. Driehaus,*
   573 U.S. 149 (2014) .......................................................................2, 3, 5

*Tenn. Wine & Spirits Retailers Ass'n v. Thomas,*
   588 U.S. 504 (2019) .............................................................................39

*Texas v. Cardona,*
   743 F.Supp.3d 824 (N.D. Tex. 2024) .................................................5

*Texas v. EPA,*
   829 F.3d 405 (5th Cir. 2016) ...............................................................6

*Turek v. Gen. Mills, Inc.,*
   662 F.3d 423 (7th Cir. 2011) .............................................................27

*Turtle Island Foods SPC v. Soman,*
   424 F.Supp.3d 552 (E.D. Ar. 2019) .................................................10

*Turtle Island Foods, S.P.C. v. Strain,*
  65 F.4th 211 (5th Cir. 2023)..................................................................................3, 4, 7

*United States v. Davis,*
  139 S. Ct. 2319 (2019)..................................................................................18

*United States v. L. Cohen Grocery Co.,*
  255 U.S. 81 (1921)..................................................................................19

*Va. State Bd. of Pharmacy v. Va. Consumer Council,*
  425 U.S. 748 (1976)..................................................................................9

*Veasey v. Abbott,*
  830 F.3d 216 (5th Cir. 2016)..................................................................................31

*Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n,* 945 F.3d 206 (5th Cir. 2019)......................passim

*Whitmore v. Arkansas,*
  495 U.S. 149 (1990)..................................................................................6

*Winters v. New York,*
  333 U.S. 507 (1948)..................................................................................19

**Statutes**

15 U.S.C. § 45..................................................................................15

21 U.S.C. § (a)(1)..................................................................................15

21 U.S.C. § 321(f)..................................................................................25

21 U.S.C. § 343(i)(1)..................................................................................26

21 U.S.C. § 343–1(a)(1)-(5)..................................................................................24, 25

25 Tex. Admin. Code § 229.902(11)..................................................................................21

25 Tex. Admin. Code. § 229.903(5)..................................................................................23

5 U.S.C. § 553..................................................................................25

Iowa Code Ann. § 137E.3(3)..................................................................................17

Tex. Bus. & Com. Code § 17.46..................................................................................15

Tex. Health & Safety Code § 431.059..................................................................................3

Tex. Health & Safety Code § 431.0805..................................................................................1, 19

Tex. Health & Safety Code § 431.0805(3)..................................................................................22

Tex. Health & Safety Code § 431.082 ..................................................................................19

Tex. Health & Safety Code § 431.082(d-1) ................................................................1, 19, 29

Tex. Health & Safety Code § 431.082(d-1)(5) ...................................................................23

Tex. Health & Safety Code § 433.0415 ..................................................................................1

**Other Authorities**

136 Cong. Rec. at s16611 ......................................................................................................24

58 Fed. Reg. 2462 (Jan. 6, 1993) ..........................................................................................24

Bob Sechler, *What is 'beef'? Texas bill would block imitations from using the term*,
   Chi. Trib. (Jan. 29. 2021),
   https://perma.cc/Z3LB-D766 ....................................................................................... 31, 33

FDA Guidance for Industry: Food Labeling Guide,
   https://www.fda.gov/regulatory-information/search-fda-guidance-documents/guidance-
   industry-food-labeling-guide ..............................................................................................28

Julie Tomascik, *Meat labels subject of truth in labeling bill*,
   Tex. Farm Bureau (Mar. 9, 2023) ................................................................................ 31, 32

Public Hearing on S.B. 664 Before the Senate HHS Committee,
   2023 Leg., 88th Sess. (May 29, 2023), https://perma.cc/GUS7-J3UW ............................32

S.B. 664 ...................................................................................................................... 1, 3, 4, 6

**Rules**

Fed. R. Civ. P. 56(c) ......................................................................................................... 2, 10

Fed. R. Civ. P. 56(e) ...............................................................................................................2

**Regulations**

21 C.F.R. § 101.3 ........................................................................................................... 26, 28

21 C.F.R. § 102.5 ........................................................................................................... 22, 26

## INTRODUCTION

This case is straightforward: Texas is imposing vague, onerous, and unnecessary restrictions on truthful commercial speech in violation of both the U.S. Constitution and the federal Food, Drug, and Cosmetic Act's ("FDCA") express preemption provision. Plaintiffs are requesting a declaration that S.B. 664 (the "Law")[1] is unconstitutional and seeking a permanent injunction preventing enforcement of the Law.[2]

The Law requires Plaintiffs to label their products with qualifying language such as "plant-based," "meatless," or "analogue" in "prominent type equal to or greater in size than the surrounding type and in close proximity to the product name." Tex. Health & Safety Code § 431.082(d-1). However, Plaintiffs' labels already clearly communicate that their products are plant-based and comply with the federal food labeling scheme. Texas also has longstanding consumer protection laws that prohibit "false or misleading" food labeling. The State has no evidence these existing laws are inadequate and knows of no complaints alleging confusion about the nature of plant-based meat products or how they are labeled. Indeed, the undisputed record demonstrates Texas lawmakers created this law not because of consumer confusion—there was none—but because politically powerful in-state animal-meat producers pushed for the law for their own benefit.

The State cannot demonstrate that Plaintiffs' speech is at all misleading, and cannot demonstrate a legitimate interest in the Law, let alone that the Law advances such an interest. The law therefore fails the *Central Hudson* test and violates the First Amendment. The Law is rendered impermissibly vague by its failure to define key terms like "product name" and "similar qualifying term" used to measure compliant conduct—as Texas' own enforcement officials admit. Additionally, because the Law imposes requirements "different from or in addition to" certain

---

[1] Codified at Texas Health & Safety Code §§ 431.0805, 431.082(d-1), 433.0415.
[2] Despite Defendants' assertion, Defendants' Motion for Summary Judgment, Dkt. 52, at 2, Plaintiffs have not and are not seeking a preliminary injunction in this case.

federal labeling requirements, it runs afoul of the FDCA's express preemption provision. Finally, the Law violates the Commerce Clause by gravely burdening the interstate market for plant-based meat products to the benefit of in-state animal-meat producers while serving no legitimate local interest.

For these reasons, Defendants' Motion for Summary Judgment should be denied, and Plaintiffs' Cross Motion for Summary Judgment should be granted.

## LEGAL STANDARD

A court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the initial burden to demonstrate the absence of genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When asserting facts in support of a summary judgment motion, the moving party must "cite to particular parts of materials in the record" or "show[] that the materials do not establish the [] presence of a genuine dispute." Fed. R. Evid. 56(c). If the movant succeeds, the burden then shifts to the nonmoving party to identify reasonable disputes of material fact. *See* Fed. R. Civ. P. 56(e). On a motion for summary judgment, the court views evidence in the light most favorable to the nonmoving party. *Malacara v. Garber*, 353 F.3d 393, 398 (5th Cir. 2003).

## ARGUMENT

I.    **Plaintiffs Have Article III Standing.**

A.    **Plaintiffs have sufficiently demonstrated an injury-in-fact under Driehaus.**

Defendants assert that Plaintiffs, entities regulated by and subject to criminal penalties under the Law, cannot allege a credible threat of enforcement because (1) Defendants have not yet enforced the law against Plaintiffs, and (2) Plaintiffs have not specified how they are arguably violating the Law. Defs' Motion, Dkt. 52 at 7. Neither of these factors are relevant under *Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014).

To challenge a statute that carries criminal penalties before enforcement proceedings have begun, "a plaintiff . . . must 'demonstrate a realistic danger of sustaining a direct injury [from its] enforcement.'" *Hobby Distillers Ass'n v. Alcohol & Tobacco Tax & Trade Bureau*, 740 F.Supp.3d 509, 518 (N.D. Tex. 2024) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).[3] As the Fifth Circuit made clear, "all [a plaintiff] must show is that: (1) it intends to engage in a course of conduct arguably affected with a constitutional interest; (2) that the course of action is arguably proscribed by statute; and (3) that there exists a credible threat of prosecution under the statute." *Turtle Island Foods, S.P.C. v. Strain*, 65 F.4th 211, 215 (5th Cir. 2023) (citing *Driehaus*, 573 U.S. at 159). Plaintiffs have more than demonstrated that their intent to engage in arguably proscribed conduct is serious, and that their threat of prosecution is highly credible. *See Babbitt*, 442 U.S. at 298-99.

This Court found that Plaintiffs had sufficiently alleged Article III standing at the pleading stage. Order on Motion to Dismiss ("MTD Order"), Dkt. 25, at 11-15. At summary judgment, Plaintiffs must cite specific facts on the record to support their standing argument. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Plaintiffs do so here, satisfying all three *Driehaus* factors and demonstrating standing to bring a pre-enforcement suit against S.B. 664.[4]

First, Tofurky testified that it intends to continue using its current, FDCA-compliant labels nationwide.[5] Ransom Decl., Ex. 1, at ¶7. "The Fifth Circuit has already held in a previous case involving Tofurky that 'Tofurky's labels and marketing . . . are just the kind of commercial activity

---

[3] S.B. 664 carries criminal penalties. Tex. Health & Safety Code § 431.059 (outlining criminal penalties for violations of state misbranding law, amended by S.B. 664, and noting that "it is not necessary to prove intent, knowledge, recklessness, or criminal negligence of the defendant").

[4] The *Driehaus* factors are all that are needed to confer pre-enforcement standing, but in cases involving First Amendment speech concerns, "chilled speech or self-censorship is an injury sufficient to confer standing." *Turtle Island Foods, S.P.C. v. Strain*, 65 F.4th 211, 215 (5th Cir. 2023) (quoting *Barilla v. City of Houston*, 13 F.4th 427, 431 (5th Cir. 2021)).

[5] Tofurky is an out-of-state firm who actively engages in the interstate market, and "their ability to engage in the interstate [] market in Texas has been curtailed by SB [664]." *NextEra*, 756 F.Supp.3d at 442. Tofurky's conduct is thus imbued with multiple constitutional interests, including free speech and interstate commerce.

the First Amendment protects.'" MTD Order, Dkt. 25, at 12 (quoting *Strain*, 65 F.4th at 216).

Tofurky will continue to engage in the interstate dissemination of its products and constitutionally

protected, truthful, commercial speech, in a manner arguably proscribed by the challenged Law.

Second, as this Court previously found, "Tofurky's products may be considered misbranded

under the Amendment." MTD Order, Dkt. 25, at 12 (Explaining Tofurky has a product where the

words "plant-based" are slightly smaller than the word "burger"). As Plaintiffs demonstrate, the Law

is impermissibly vague, so it is inherently unclear whether Tofurky is complying with it. *See infra* III.

Defendants even contradict themselves on this point: at once claiming they are "not currently aware

of 'any plant-based product that's been determined to be misleading in Texas," Defs' Motion, Dkt.

52, at 7, then later arguing that Plaintiffs' labels "can *and do* mislead [consumers]," and that absent

S.B. 664 such "inherently misleading" conduct would continue. *Id.* at 23 (emphasis added).[6] Because

Defendants cannot even make up their mind as to whether Plaintiffs are violating S.B. 664,

Plaintiffs' conduct is certainly arguably proscribed by the Law.

Third, Tofurky has sufficiently demonstrated a credible fear of prosecution. "[W]hen dealing

with pre-enforcement challenges to recently enacted (or, at least, non-moribund) statutes that facially

restrict expressive activity by the class to which the plaintiff belongs, courts will assume a credible

threat of prosecution in the absence of compelling contrary evidence." *Speech First, Inc. v. Fenves*, 979

F.3d 319, 334-35 (5th Cir. 2020) (quoting *N.H. Right to Life PAC v. Gardner*, 99 F.3d 8, 15 (1st Cir.

1996)). As detailed above, the Law restricts constitutionally protected commercial speech by

companies, including Plaintiffs, that manufacture plant-based products. Defendants have not

produced any evidence, let alone *compelling* evidence, to counter Plaintiffs' credible fear.

---

[6] Elsewhere, Defendants argue that the Court should not look to *Strain* because here Tofurky is not engaging in "arguably proscribed" conduct. *See* Dkt. 52 at 3 n.10. This is undermined by the fact that Defendants concede this point when they state that Plaintiffs are, in their eyes, currently misleading Texas consumers. *See id.* at 23. Defendants' contradictory statements aside, this Court has already noted how the Law arguably proscribes some of Tofurky's current labels. Dkt. 25 at 12.

Whether Defendants have enforced the Law against Plaintiffs yet is irrelevant to the inquiry. Courts assume that states can and will enforce their own criminal laws as long as a law is non-moribund. *Speech First*, 979 F.3d at 336 (quoting *Blum v. Holder*, 744 F.3d 790, 798 n.11 (1st Cir. 2014). Given the Law was enacted mere months before this lawsuit to satisfy a strong political push from animal-meat industry lobbyists, there is no basis to conclude the Law is moribund.[7] Indeed, Defendants explicitly refused to stay enforcement during the pendency of this suit, Swistara Decl., Ex. 2, at ¶3, and Defendants testified inspectors are actively looking for violations. Stevenson Dep., Ex. 3, at 181:5-12.

Plaintiff Tofurky has sufficiently demonstrated that all three *Driehaus* factors are met. As the Court preliminarily found earlier in these proceedings, *see* MTD Order, Dkt. 25, Tofurky has Article III standing to bring a pre-enforcement challenge under the First Amendment.

### B. Plaintiffs have sufficiently demonstrated an injury-in-fact in the expense and trouble of complying with Texas' unlawful statute.

Defendants assert Plaintiffs cannot show an injury-in-fact because Tofurky's Chief Growth Officer testified that a label redesign would cost the company "75[,000] to $100,000," which Defendants characterize as a "nominal expense." Defs' Motion, Dkt. 52, at 5. This argument mischaracterizes both the law and Plaintiffs' testimony. While a credible fear of enforcement is enough to satisfy standing, *Driehaus*, 573 U.S. at 158-59, "the expense and trouble of complying [with challenged rules] is a cognizable injury in itself." *Texas v. Cardona*, 743 F.Supp.3d 824, 853 (N.D. Tex. 2024). "Alleged compliance costs need only be 'more than de minimis,'" *Career Coll. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 236 (5th Cir. 2024) (quoting *Rest. L. Ctr. v. U.S. Dep't*

---

[7] The "moribund" exception is narrow. *N.H. Right to Life*, 99 F.3d 8, 15 (1st Cir. 1996). It requires laws that have become "historical curiosity" via a prolonged history of non-enforcement. *Navegar v. United States*, 103 F.3d 994, 1000 (D.C. Cir. 1997) (80-year-old law with no enforcement); *Poe v. Ullman*, 367 U.S. 497 (1961) (one prosecution in 80 years). Defendants' assertion that Tofurky's injuries are "chimerical" rests upon a case where the law in question had not been enforced at all for multiple decades. *Steffel v. Thompson*, 415 U.S. 452, 459 (1974).

*of Labor*, 66 F.4th 593, 600 (5th Cir. 2023)) and rooted in "more than an unfounded fear." *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016). Plaintiff Tofurky has demonstrated that compliance with the Law could likely result in millions of dollars of harm.

As Tofurky's Chief Growth Officer explained, just changing the physical labels to comply with Texas law will likely cost Tofurky "many tens and tens of thousands of [] dollars," in the form of writing off "as many as two years' worth of packaging inventory," heavily discounting product already in the marketplace, and costs associated with buying, designing, ensuring compliance, warehousing, and distributing new packaging. Ransom Dep., Ex. 4, at 84:18-85:13. Tens of thousands of dollars is certainly "more than de minimis." *Career Coll. & Schs.*, 98 F.4th at 236.

Further, as Julie Emmett described in her expert report, and contrary to Defendants' assertion that the only costs of complying with S.B. 664 are those of a label redesign, Defs' Motion, Dkt. 52 at 5, Tofurky and other PBFA members are also likely to incur lost business from impacted distributor relationships and penalties levied against companies who cannot realistically prevent their products from ending up in Texas. Expert Report of Julie Emmett ("Emmett Rep."), Ex. 5, at 11-15. Such costs would reverberate far beyond Texas. *See id.* at 13 ("plant-based meat sales nationwide [do] not rise to the level [] that would be worth it for [a distributor] to develop the necessary logistical workarounds . . . Instead, the distributor confirmed they would simply not be able to carry those products at all, in any state").

Nowhere do Plaintiffs claim, as Defendants insist, that their injuries stem from "future outcomes in pending litigation." Defs' Motion, Dkt. 52, at 4. Plaintiffs' injuries are based on the real economic costs, to Tofurky and other PBFA members, of attempting to comply with a vague law and risking enforcement. None of these injuries stem from future litigation outcomes. In support of their position, Defendants cite unrelated cases about tenuous future injuries, for example, *Whitmore v. Arkansas*, wherein the injury would have required a person convicted of murder seek (and be

6

granted) habeas corpus relief, *then* be convicted, and *then* be re-sentenced to death after a new trial. 495 U.S. 149, 159-60 (1990). The cited cases rely "on the occurrence of numerous uncertain future events," and are easily distinguishable from the present case. *See Prestage Farms, Inc. v. Bd. of Supervisors of Noxubee Cty.*, 205 F.3d 265, 268 (5th Cir. 2000). From the cost of label changes to the real risk of prosecution and harm to distributor relationships, Plaintiffs' alleged costs of compliance are well founded and constitute an injury in fact.

### C. Plaintiffs' injuries are traceable to Defendants.

This "Court has already found" that the three named Defendants "have the authority to enforce the Amendment." MTD Order, Dkt. 25, at 13. Defendants do not challenge this authority. Instead, Defendants retreat to their already-dismissed argument that traceability is defeated because no enforcement action has been commenced against Plaintiffs. Defs' Motion, Dkt. 52, at 8. This argument was summarily rejected at the motion to dismiss stage and should be rejected again here.

As this Court explained, "when a plaintiff brings a pre-enforcement challenge to a recently enacted statute that facially restricts the plaintiff's expression by restricting the class to which the plaintiff belongs, 'we will assume a credible threat of prosecution.'" MTD Order, Dkt. 25, at 13 (quoting *Turtle Island Foods*, 65 F.4th at 218). The Court rightfully rejected Defendants' contention that Plaintiffs' injuries were not traceable because there had been no enforcement action against Plaintiffs to date. *Id.* Likewise, this Court dismissed the idea that notice of a violation is required. *Id.*

Defendants then argue that Plaintiffs' injuries cannot be traceable to the Attorney General, as his office has not (yet) received a request for enforcement from the other Defendants. Defs' Motion, Dkt. 52, at 8-9. Again, the initiation of enforcement actions is not a prerequisite for standing. MTD Order, Dkt. 25, at 13. What's more, a court in this District previously found standing to challenge a law "even absent the delegation of authority to independently prosecute election law offenses" as the challenged provisions at issue there "still envision, and likely require,

the Attorney General's participation in enforcement activities." *La Unión del Pueblo Entero v. Abbott*, 618 F.Supp.3d 504, 536 (W.D. Tex. 2022).

### D. Plaintiffs' injuries would be redressed by the requested remedy.

An injunction prohibiting Defendants from enforcing the Law would relieve Plaintiffs "both from the threat of prosecution or enforcement and from having to assume the burden of redesigning [their] product labels." MTD Order, Dkt. 25, at 14. Defendants' sole argument to the contrary is again that there is no traceable injury. As this Court already found, a recently enacted law can be fairly traced—and thus, redressed through injunctive relief—to state officers with the power to enforce said law. *Id.* at 13.

### E. PBFA has associational standing.

"An association has standing to bring claims on behalf of its members when it meets three requirements: (1) its individual members would have standing to bring the suit; (2) the association seeks to vindicate interests germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the individual members' participation." *NetChoice, L.L.C. v. Fitch*, 134 F.4th 799, 804 (5th Cir. 2025).

As demonstrated, Tofurky, a PBFA member, has standing to bring this suit. PBFA is participating in this lawsuit to protect its members from vague and burdensome labeling requirements. *See* Mulhall Decl., Ex. 6, at ¶4. ("PBFA's organizational mission includes supporting plant-based companies and ensuring a level regulatory playing field for their products"). Neither the claims nor the requested relief necessitate the participation of additional PBFA members. This challenge focuses on the text and nationwide impact of the Law, and the Court does not need to conduct fact-specific inquiries regarding other PBFA members to evaluate the Law's constitutionality or whether it contravenes the FDCA. *See Ass'n of Am. Physicians & Surgeons, Inc. v. Texas Med. Bd.*, 627 F.3d 547, 552 (5th Cir. 2010) ("[A]s long as resolution of the claims benefits the

association's members and the claims can be proven by evidence from representative injured members, without a fact-intensive-individual inquiry, the participation of those individual members will not thwart associational standing.") Accordingly, PBFA has associational standing.

## II.     The Law Violates the First Amendment.

The parties agree the labels at issue are commercial speech. Defs' Motion, Dkt. 52, at 21. Truthful commercial speech that is not related to unlawful activity is protected by the First Amendment. Under this doctrine, food producers have a First Amendment right to provide consumers with non-misleading information about their products, including on labels. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 566 (1980); *see 44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 495–99 (1996). The First Amendment also protects consumers' right to receive non-misleading commercial information. *Va. State Bd. of Pharmacy v. Va. Consumer Council*, 425 U.S. 748, 757 (1976). Where the government seeks to uphold a restriction on commercial speech, it "carries the burden of justifying it." *Edenfield v. Fane*, 507 U.S. 761, 770 (1993) (quoting *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 71, n. 20 (1983). Here, the State has failed to carry its burden.

### A.  Plaintiffs' speech is entitled to First Amendment protection.

Plaintiffs' speech is neither misleading nor related to unlawful activity. Defendants have failed to provide any evidence to the contrary. Plaintiffs' speech is therefore entitled to First Amendment protection.

#### 1.  Plaintiffs' speech is not misleading.

The speech at issue—food labels used by Tofurky and other PBFA members on plant-based meat products—is not false or deceptive. Tofurky's labels state in large print that the products are "plant-based" and "vegan." Am. Complaint, Dkt. 13, at 11-13. These labels clearly indicate the nature of these products to consumers, as Plaintiffs' experts confirmed through a survey asking Texas consumers to identify the contents of various plant-based and conventional meat products by looking at images of their labels. Expert Report of Professors Adam Feltz and Silke Feltz ("Feltz

9

Rep."), Ex. 7, at 8–10. Respondents correctly identified that the meatless products were plant-based and not made from animals with an average 96% accuracy. *Id.* at 13. Plaintiffs' experts also reviewed available empirical evidence on consumer confusion over plant-based labels generally and concluded that "consumers are not confused by plant-based terms used in conjunction with traditional animal-based terms." *Id.* at 4.

Despite this evidence, the State claims that "Tofurky and PBFA's labels can and do mislead traditional meat-eating customers into buying their product." Defs' Motion, Dkt. 52, at 22. Defendants fail to offer a single piece of evidence in support of this assertion and confirmed that they never even conducted or reviewed any studies on consumer understanding of plant-based meat labels. Stevenson Dep., Ex. 3, at 128:17-129:6. On a motion for summary judgment, factual assertions must be supported by documents, affidavits, or other evidentiary material. Fed. R. Civ. P. 56(c). Defendants cannot rely on conclusory assertions alone. As the Fifth Circuit held, "evidence of deception is necessary to sustain a finding that commercial speech is actually misleading." *Express Oil Change, L.L.C. v. Mississippi Bd. of Licensure for Pro. Eng'rs & Surveyors*, 916 F.3d 483, 491 (5th Cir. 2019). Absent any evidence of deception, the State's argument fails.

The only evidence on the record demonstrates that labels like those used by Tofurky and PBFA's other members are not misleading. Feltz Rep., Ex. 7, at 13. Furthermore, federal courts have repeatedly held that labels which include conventional animal food terms alongside terms that convey the plant-based nature of the product are not misleading and do not cause consumer confusion. In *Turtle Island Foods SPC v. Soman*, for example, the court held that Tofurky's labels are not misleading, despite including conventional meat terms, because they "include ample terminology to indicate the vegan or vegetarian nature of the products." 424 F.Supp.3d 552 (E.D. Ar. 2019); *see also Painter v. Blue Diamond Growers*, No. CV 17-02235, 2017 WL 4766510, at *2 (C.D. Cal. May 24, 2017), *aff'd*, 757 F. App'x 517 (9th Cir. 2018); *Ang v. Whitewave Foods Co.*, No. 13-CV-1953, 2013 WL

10

6492353, at *4 (N.D. Cal. Dec. 10, 2013); *Gitson v. Trader Joe's Co.*, No. 13-CV-01333-VC, 2015 WL

9121232, at *1 (N.D. Cal. Dec. 1, 2015); *Miyoko's Kitchen v. Ross*, Case No. 20-cv-00893-RS, 2021 WL

4497867 (N.D. Cal. Aug. 10, 2021). The same conclusion applies here. Plaintiffs' labels, and plant-

based meat labels broadly, are not misleading and do not deceive consumers.

>        **2.  Plaintiffs' speech does not concern unlawful non-speech activity.**

Defendants attempt the circular argument that Tofurky's speech is related to unlawful

activity because that speech is restricted by the Law. Defs' Motion, Dkt. 52, at 24. But the very

speech restriction challenged in this case cannot serve as the hook for claiming the speech relates to

unlawful activity. If that were the case, no commercial speech restriction could *ever* be successfully

challenged under *Central Hudson* because the state could *always* claim that the speech restriction itself

renders the speech related to unlawful activity. This circular logic cannot hold. Instead, the State

must demonstrate that the restricted speech is related to unlawful commercial activity separate from

the speech itself. *See Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 506 (5th Cir. 2001).

The State cites *Ford* to support its argument that speech can be considered "related to

unlawful activity" if only the speech itself is outlawed. But *Ford* stands for the opposite proposition.

In that case, Ford challenged a Texas law that prohibited car manufacturers from obtaining dealer

licenses to sell cars directly to consumers. *Id.* at 498. Ford claimed the law restricted the company's

First Amendment right to advertise the sale of vehicles directly to consumers. *Id.* at 505–06. The

court held that such advertising was not protected because it was related to an underlying unlawful

activity—the act of selling cars directly to consumers. As the court explained, the restriction on

advertising was "only incidental to" the law's prohibition on "the economic activity of retailing

automobiles." *Id.* at 506. In contrast, the court continued, if the law had "prohibited advertising the

sale of motor vehicles by licensed dealers…the regulation would invoke the protections of the First

Amendment and be subjected to the intermediate scrutiny outlined in *[Central] Hudson*." *Id.* This

hypothetical maps perfectly onto the Law at issue here. The Law does not ban any underlying

economic activity such as the sale of plant-based meat in Texas; it only restricts how they may be labeled. In other words, it only restricts speech related to otherwise lawful commercial activity. Under the logic set forth in *Ford*, the Law must be "subjected to the intermediate scrutiny" test set forth in *Central Hudson. Id.*

Defendants also cite *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978) and *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949), for the proposition that the First Amendment does not prevent states from enacting regulations to restrict commercial activity that harms consumers. While that statement is true, it is irrelevant to whether Plaintiffs' speech is related to unlawful commercial activity. The State has not pointed to any regulation on commercial activity that Plaintiffs' actions allegedly violate.

Furthermore, as in *Ford*, the Courts in *Ohralik* and *Giboney* concluded that any speech restrictions resulting from the laws at issue in those cases were only incidental to the underlying restrictions on commercial activity. In *Ohralik*, the court reviewed an ambulance-chasing law and held that "[a] lawyer's procurement of remunerative employment is a subject only marginally affected with First Amendment concerns." 436 U.S. at 459. Likewise, the court in *Giboney* reviewed the enforcement of an antitrust law and held that any resulting speech restriction was incidental to the underlying economic regulation, even though the appellant had used speech to unlawfully restrain trade. 336 U.S. at 492.[8] In contrast, the Law at issue here only restricts speech. It does not prohibit Plaintiffs from conducting their regular business of selling plant-based meat products in the state, nor is selling these products prohibited by any other applicable law. These cases thus do not support the State's claim that Plaintiffs' speech is related to some underlying unlawful activity.

---

[8] Notably, both *Ohralik* and *Giboney* predate *Central Hudson*, and thus did not engage with the question of whether that test applied to the speech at issue.

Defendants have not and cannot demonstrate that Plaintiffs' speech is misleading, nor that it relates to unlawful activity. Plaintiffs' speech is therefore protected by the First Amendment.

### B. Defendants have failed to prove that the Law is a permissible restriction on commercial speech.

A government restriction on commercial speech that is not misleading or related to unlawful activity can only survive if the enacting state can meet its burden under the three-prong test set forth in *Central Hudson*. To do so, the government must: (1) assert a substantial government interest; (2) demonstrate that the speech restriction directly and materially advances that interest; and (3) demonstrate that the speech restriction is not more extensive than necessary to advance the state's interest. *Cent. Hudson*, 447 U.S. at 566; *Edenfield*, 507 U.S. at 767. Here, the State has failed to meet its burden on either the second or third prong. As such, the Law must be struck down.

#### 1. Defendants have not demonstrated that the Law's restrictions directly advance any substantial government interest.

The State carries the burden of demonstrating that the Law directly and materially advances a substantial government interest. "This burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Edenfield*, 507 U.S. at 770–71. Here, the State has failed to demonstrate either that the harm it asserts is real or that the Law will materially alleviate that purported harm.

The State asserts that its interest in enacting the Law is to protect consumers by ensuring they "understand the nature of the products they are purchasing." Defs' Motion, Dkt. 52, at 24.[9] Consumer protection can be a legitimate state interest. But here, the State provides no evidence that:

---

[9] In addition to consumer confusion, Defendants also offer the bare assertion that Texas Legislature "enacted S.B. 664 to protect Texans from purchasing and ingesting foods that could…be harmful." Dkt. 52 at 25. Defendants' assertion here is provided without any support. Nowhere in the record is there a shred of evidence that plant-based products are harmful, or that Texas legislators thought they could be harmful when passing the Law.

(1) consumers have any confusion over current plant-based meat labels or (2) altering the font size and placement of various labeling elements will alleviate the alleged confusion.

Defendants have repeatedly stated they are not aware of any instances of consumer confusion over plant-based meat products in Texas. *E.g.,* Stevenson Dep., Ex. 3, at 128:14-16 (no knowledge of Defendants ever having received a consumer complaint alleging the kind of confusion the Law seeks to address); *id.* 134:1-16 (not aware of any consumer complaints about plant-based meat products, generally, and Defendants have not done any research into confusion over plant-based labels); Ressler Dep., Ex. 8, at 37:14-19 (no records of such complaints); Email from Lewis Ressler, Manager, Manufactured Foods Div., to Jonathan Miles, Open Records Dept. (Dec. 20, 2023), Ex. 9 (no "evidence of consumer confusion."); Email from James R. Dillon, Dir., Tex. Meat Safety Assurance, to Greg Wilburn, Policy Officer, Consumer Prot. Div. (Mar. 18, 2021), Ex. 10 ("none of us have seen any complaints regarding customers being tricked with imitation meat"); Defs. Resp. to Pls. First Reqs. Prod. No. 4, Ex. 11 (no responsive documents "relating to evidence of [] consumer confusion"); *id.* No. 5. If these products were confusing, complaints would have surfaced by now. Contrary to Defendants' assertion, plant-based meats are not "a new development," Defs' Motion, Dkt. 52, at 16—they have existed since at least the Han Dynasty in 206 B.C.E., Swistara Decl., Ex. 2, at ¶5, Tofurky has been operating for forty-five years, Ransom Decl., Ex. 1, at ¶8, and Defendants have regulated plant-based meat "[a]s a manufactured food product [] for decades." Stevenson Dep., Ex. 3, at 73:17-20. "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). Defendants have failed to provide any factual support for their argument that consumer confusion is a real harm and not "mere speculation or conjecture" and thus cannot succeed on their motion. *Edenfield*, 507 U.S. at 770.

Furthermore, even if Defendants could show that consumer confusion exists, they fail to prove that the Law directly and materially alleviates such confusion. They claim that "Texas has no other means" of protecting consumers. But numerous preexisting Texas and federal laws already protect consumers from misleading or deceptive labeling and advertising. The FDCA categorizes a food product as "misbranded" if "its labeling is false or misleading in any particular." 21 U.S.C. § 352 (a)(1). The FTCA prohibits "unfair or deceptive acts or practices" in or affecting commerce. 15 U.S.C. § 45. Likewise, the Texas Deceptive Trade Practices Act prohibits "false, misleading, or deceptive acts." Tex. Bus. & Com. Code § 17.46. Misleading labels and advertisements are fully prohibited by these statutes and Defendants have acknowledged as much. *See* Proposed Response to Buckley's Office, Ex. 12 (stating that "DSHS already prohibits the sale of mislabeled food products" and that it "ha[s] that authority already" to "regulate the labeling of 'alternatives' to meat"). If the purpose of the Law is simply to prevent misleading labeling, it adds nothing to the existing body of law and therefore does not materially advance Defendants' purported interest.

Defendants also attempt to defend their burdensome font size and placement requirements by claiming that "most disclaimers are so small that consumers can never even read the fine print," but cite no evidence to support this claim. They also state that companies "might" fail to use print large enough for consumers to read, but point to no examples, despite bearing the burden of proof. "Texas must meet a higher standard than 'might.' 'A governmental body seeking to sustain a restriction on commercial speech must demonstrate that…its restrictions will in fact alleviate the harms to a material degree.'" *Free Speech Coal., Inc. v. Paxton*, 95 F.4th 263, 283–84 (5th Cir.), *cert. granted*, 144 S. Ct. 2714 (2024), *and aff'd*, 145 S. Ct. 2291 (2025) (quoting *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 626 (1995)) (internal brackets removed). Defendants' failure to cite any evidentiary material, relying instead on what "might" happen without the Law, dooms their motion. *Celotex*, 477 U.S. at 322 ("Rule 56(c) mandates the entry of summary judgment…against a party who fails to

make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."). Plaintiffs, meanwhile, have provided ample evidence that existing plant-based meat labels are clear and easy to read, with large disclaimers that communicate the nature of their products. Am. Compl., Dkt. 13, at 11-13. Furthermore, empirical evidence demonstrates that consumers are not confused by these labels, and that changing the law may even *create* consumer confusion. Feltz Rep., Ex. 7, at 13, 18. Plaintiffs' experts surveyed Texas-based consumers to compare images of current plant-based meat labels with modified images of those same labels, altered to arguably conform with the Law. *Id.* at 14–17. In most cases, respondents accurately identified the products with the original and the modified labels as plant-based with statistically equal accuracy. *Id.* at 18. The only statistically significant difference was an *increase* in confusion when one of the labels was modified to comply with the Law. *Id.* Based on this data, the experts concluded: "There is nothing to support the Defendants' assertion that making small changes to the font size and placement of these disclaimers will have any impact on consumer understanding…changing labels to comply with the Law will not reduce, and may even increase, consumer confusion." Feltz Rep., Ex. 7, at 18. With "nothing in the record to substantiate the State's allegations of harm," and no evidence that the Law will materially advance the State's interest, the speech regulation cannot stand. *Fla. Bar,* 515 U.S. at 626.

### 2. Defendants have failed to demonstrate that the Law is not more restrictive than necessary to accomplish the state's purported purpose.

Even if the Court finds that the State has demonstrated real harm and that the Law directly and materially advances the State's purported interest, the Law cannot stand because Defendants fail to satisfy the third prong of the *Central Hudson* test. While this prong does not demand the State employ the least restrictive means available, it does require any speech restriction to be "narrowly tailored to achieve the desired objective." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 556 (2001). The

Law here is not narrowly tailored and is more restrictive than necessary to accomplish the State's purported goal.

Defendants argue that the Law is the only means "to direct companies like Tofurky and PBFA into creating labels that will educate the public about the food they are actually purchasing." Defs' Motion, Dkt. 52, at 25. This statement unsupported by any evidentiary material, and patently untrue. First, existing labels already sufficiently educate consumers about the contents of plant-based foods. Feltz Rep., Ex. 7, at 13, 18. Second, other states have implemented far less burdensome laws requiring disclaimers on plant-based products. Iowa, for example, requires plant-based meat products to include "a conspicuous and prominent qualifying term in close proximity to an identifying meat term." Iowa Code Ann. § 137E.3(3). This ensures that the qualifying term (e.g., "plant-based" or "meatless") is prominently displayed and placed close to any meat term on the label, without burdening plant-based producers with the exacting font size and placement rules that the Law imposes. The Law requires plant-based meat producers to spend significant sums reprinting their labels, navigate a conflicting patchwork of state labeling laws that hinders or fully prevents their ability to distribute their products, *see* Emmett Rep., Ex. 5, at 11–16, and infringes on their First Amendment right to design useful and accurate product labels—all while less restrictive options are available to ensure clear labeling.

Defendants have provided the Court with no evidence that the Law is their best option for reducing consumer confusion. To the contrary, the evidence before the Court indicates that the Law would do nothing to improve consumer understanding of plant-based meat labels and even *causes* confusion, Feltz Rep., Ex. 7, at 18, 21. The Law therefore cannot be considered "narrowly tailored" and fails the third prong of *Central Hudson*.

17

**C. The Act violates the First Amendment under any legal standard.**

Even under lower levels of scrutiny, Plaintiffs would prevail. In any commercial speech case, defendants must, at a minimum, prove that their regulation is neither "unjustified nor unduly burdensome" and will remedy a harm that is not "purely hypothetical." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 776 (2018). In *Am. Beverage Ass'n v. City & Cnty. of San Francisco*, the court applied the lowest level of First Amendment scrutiny and held that the defendants failed to show that an ordinance requiring health warnings on advertisements for sugar-sweetened beverages was not unduly burdensome. 916 F.3d 749, 757 (9th Cir. 2019). The ordinance required warnings to "occupy at least 20% of the advertisement." *Id.* at 754. Evidence showed that, although larger warning labels may be more effective, warnings half the size would also accomplish the government's purported goal. The court concluded that, "because the findings suggest that the Ordinance's goals could be accomplished with a smaller warning...the 20% requirement is not justified when balanced against its likely burden on protected speech." *Id.* at 757. Likewise, the State here has failed to justify its burdensome size and placement requirements and has provided no evidence as to why less restrictive labeling rules would be insufficient. Plaintiffs have submitted expert testimony indicating that existing labeling schemes are sufficient, and that less restrictive regulations would suffice. Accordingly, even under the lowest levels of First Amendment scrutiny, the Law cannot stand.

The Court should grant summary judgment in favor of Tofurky and PBFA and hold that the Act violates the First Amendment as applied to Plaintiffs and as a matter of law.

**III.    The Law is Unconstitutionally Vague on its Face and as Applied.**

"In our constitutional order, a vague law is no law at all." *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019). A law is impermissibly vague if: (1) it "fails to provide a person of ordinary intelligence fair notice of what is prohibited," or (2) "is so standardless that it authorizes or

encourages seriously discriminatory enforcement." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (citation omitted); *McClelland v. Katy Indep. Sch. Dist.*, 63 F.4th 996, 1013 (5th Cir. 2023).[10] The Law fails both elements.

### A. The Law fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct is prohibited.

A facial challenge to a vague law that implicates constitutionally protected conduct need not show that the challenged law is vague in all its applications to succeed. *See Johnson v. United States*, 576 U.S. 591, 602–03 (2015); *see also United States v. L. Cohen Grocery Co.*, 255 U.S. 81, 89 (1921) (holding a law prohibiting grocers from charging an "unreasonable rate" facially void for vagueness even if some scenarios—such as a grocer charging $1,000 for a pound of sugar—clearly violate the law). Instead, a law is unconstitutionally vague when people cannot reasonably predict "the line between the allowable and the forbidden." *Winters v. New York*, 333 U.S. 507, 519 (1948); *see also McClelland*, 63 F.4th at 1013 ("A regulation is void for vagueness when it is so unclear that people 'of common intelligence must necessarily guess at its meaning and differ as to its application.'"). That is precisely the case here.

The Law requires qualifying language to appear "in prominent type equal to or greater in size than the surrounding type and in close proximity to the name of the product . . ." Tex. Health & Safety Code § 431.082(d-1). Nowhere in the Law is the phrase "name of the product" defined. *See* Tex. Health & Safety Code §§ 431.0805; 431.082. This phrase is ambiguous as it does not make clear whether the requisite language must be placed beside the category (e.g., "deli slices" or "burgers"), the flavor (e.g., "hickory smoked" or "smoky maple"), the company name (e.g., "Tofurky"), the characterizing ingredient (e.g., "tempeh"), the statement of identity as mandated by the FDCA, or

---

[10] "[A] more stringent vagueness test should apply where a law threatens to inhibit the exercise of constitutionally protected rights," especially when it is "capable of reaching expression sheltered by the First Amendment," *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 552 (5th Cir. 2008), as is the case here.

some combination of these phrases, (which may be impossible on some labels). The Operations Manager for Manufactured Foods at the Department of State Health Services ("DSHS")—the head of the team tasked with enforcing the Law—was not able to say if the "name of the product" was the same as the brand name or as the statement of identity. Ressler Dep., Ex. 8, at 46:2-4, 89:13-23. Instead, he testified that he "would have [] to go to our policy attorney" to ask about whether products complied. *Id.* 89:13-90:11, 118:16-119:12. This demonstrates how unclear the Law is, even to those tasked with enforcing it.

Defendants' examples of "Frosted Flakes," "Trix—Minis," and "Lucky Charms S'mores" are unhelpful. Defs' Motion, Dkt. 52, at 20. As this Court found, consumers could reasonably think that "Kellogg's" or "cereal" is part of the name of the product for Kellogg's Frosted Flakes. MTD Order, Dkt. 25, at 26. Similarly, "Trix" and "Minis" are not in the same font typeface, size, or color, nor do they appear in the same line of text, and so knowing which term is the anchor for the Law's prominence and proximity requirements is impossible. The same is true for "Lucky Charms S'mores." Is the name of the product "Lucky Charms," "S'mores," "Lucky Charms S'mores," or something else entirely?

 

Again, all three words appear on separate lines of text, and are not all in the same font size, color, or typeface. This also disregards the product's FDCA-compliant statement of identity, "sweetened corn & wheat cereal with marshmallows," which appears on the box in smaller, uniform font as required under federal law. And without knowing the product name, producers cannot know which word or words should be used as the benchmark against which the Law's required language should be as "prominent" as and "in close proximity to."[11]

DSHS regulations only compound this confusion. For example, the rules define "product name" as "the trade name *or* brand name of their product, which ***must be clarified by*** a statement of identity." 25 Tex. Admin. Code § 229.902(11) (emphasis added). Rather than provide adequate notice to regulated entities, this further muddies the waters as to what constitutes compliant conduct. When "trade name"[12] and "brand name" (neither of which is defined) differ, which constitutes the "name of the product" for measuring the qualifier's proximity and prominence? The rules require qualifying language to be measured against "the product name *or* statement of identity," *Id.* § 229.903 (emphasis added), while simultaneously defining product names as something that must be "clarified by" a statement of identity. This leaves unclear whether the rules define "product name" as synonymous with a statement of identity, or as some additional labeling element.

Regulated companies need to know the exact size, location, and prominence requirements of the Law in order to comply with them. Ransom Decl, Ex. 1, at. ¶¶5-6. If the yardstick against which compliant conduct will be measured is not clear and readily understandable, the Law is unconstitutionally vague. *See Connally v. Gen. Const. Co.*, 269 U.S. 385, 391 (1926). Here, the Law measures compliance against the ambiguous yardsticks of "surrounding type," "close proximity,"

---

[11] Defendants note Plaintiffs' supposed inability to pinpoint precisely how they are violating the Law. Defs' Motion, Dkt. 52, at 7. The uncertainty of how Plaintiffs might (or might not) be violating the Law only further demonstrates its facial vagueness.

[12] Defendants' 30(b)(6) witness was unable to define "trade name." Stevenson Dep., Ex. 3, at 220:22-24.

and the "name of the product," leaving regulated entities unsure of how to comply. As this Court

found, "[t]o understand how to comply with the Amendment, a company must know which

identifier is the name of the product, as the Amendment requires them to place the qualifying term

in "close proximity' to 'the name of the product.'" MTD Order, Dkt. 25, at 26. That requirement

remains unmet.

The Law's failure to define the term "surrounding type," creates even greater ambiguity.

"Close proximity" is defined, but only by reference to "the name of the product," which itself is

unclear. As a court in this District recently held, undefined terms of proximity such as "physical

presence" are unconstitutionally vague. *La Unión del Pueblo Entero v. Abbott*, 751 F.Supp.3d 673, 728-

29 (W.D. Tex. 2024) (the court "cannot tell from the text of the [law] how physically proximate a

ballot must be to a volunteer or employee" to trigger the law). Here, although the proximity term is

ostensibly defined, regulated companies gain no clarity from knowing they must include qualifiers

"immediately before or after" another vague and ambiguous term. Tex. Health & Safety Code §

431.0805(3). These circular definitions only compound the statute's ambiguity.

Defendants state (without evidence) that "ordinary persons are perfectly capable of

understanding" this language. Defs' Motion, Dkt. 52, at 21. Yet, Defendants themselves were unable

to define key terms or articulate what compliance requires. *See infra* III.B. Either those tasked with

enforcement of the Law have less ability to understand the Law than "ordinary persons," or the Law

leaves enforcers free to act on nothing more than their own preferences.

Finally, it is unclear how to reconcile the requirements of the Law with existing FDCA

requirements. Because "name of the product" is undefined, producers cannot determine whether it

differs from a product's "statement of identity" under federal law, *see* 21 C.F.R. § 102.5, making it

impossible for producers to understand whether the Law requires additional labeling elements

beyond what the FDCA demands, or modifications to existing labeling elements, or whether

complying with the FDCA's prominence requirements is sufficient, or more must be done. Such ambiguity in how to reconcile the requirements of the two statutory schemes renders the law unconstitutionally vague. *E.g., Isaacson v. Brnovich*, 610 F.Supp.3d 1243, 1253 (D. Ariz. 2022); *see also La Unión del Pueblo Entero*, 751 F.Supp.3d at 728 ("[N]otice is insufficient if lay persons are required to 'perform[ ] the lawyer-like task of statutory interpretation by reconciling the text of [ ] separate documents.'") (citations omitted).

### B.  The Law is so indefinite that it encourages arbitrary and discriminatory enforcement.

A law is also impermissibly vague if it fails to "establish minimal guidelines to govern" its enforcement. *Kolender v. Lawson*, 461 U.S. 352, 358 (1983). In a pre-enforcement vagueness challenge, "[t]he question is not whether discriminatory enforcement occurred here, . . . but whether the [law] is so imprecise that discriminatory enforcement is a real possibility." *Gentile v. State Bar*, 501 U.S. 1030, 1051 (1991).

The Law creates exactly this "real possibility." For example, what constitutes "a similar qualifying term" remains unclear. Tex. Health & Safety Code § 431.082(d-1)(5); 25 Tex. Admin. Code. § 229.903(5). Companies using the characterizing ingredient (e.g., "soy") or a stylized name (e.g. "chik'n")[13] as qualifiers "intended to clearly communicate [] the contents of the product," *id.*, could be held in violation, as the statute contains no standard for what constitutes a compliant qualifying term. The manager in charge of overseeing inspections testified that inspectors have discretion, Ressler Dep., Ex. 8, at 114:6-8; *id.* at 115:1-3, and that "there's no hard and fast rule about" compliant conduct because "there's just too many nuances in [] the language." *Id.* at 115:6-22; *see id.* at 119:6-7 ("my opinion could be that [a label is] fine, and somebody else's opinion that it

---

[13] Both characterizing ingredient and stylized naming are common in the industry (e.g., "seitan bacon" or "chick'n nuggets") and have repeatedly been found to be well-understood by consumers. *See* Feltz Rep., Ex. 7, at 9-13 (finding that 92% of consumers understood a "seitan chorizo" product as 100% plant-based).

might not be fine"). Similarly, Defendants repeatedly failed to define terms necessary to understand complaint conduct. *See* Stevenson Dep., Ex. 3, at 220:8-17 (testifying that sometimes statement of identity "refer[s] to the same thing" as product name, and other times it does not); *id.* at 220:22-24 (unable to define "trade name"); *id.* at 221:14-22 (unable to say what "clarified by a statement of identity" requires).

Given the vagueness of key terms that define compliant conduct, and the high level of discretion granted to enforcement officers, there is a real possibility that the Law will be enforced in a discriminatory manner.

**IV.    The Law is expressly preempted by the FDCA.**

**A.    Congress created the FDCA's express preemption provision to ensure a uniform nationwide labeling scheme.**

In 1990, Congress modified the federal FDCA by enacting the Nutrition Labeling and Education Act ("NLEA") because it recognized the need for "national uniformity in certain aspects of food labeling, so that the food industry can market its products efficiently in all 50 States in a cost-effective manner." 58 Fed. Reg. 2462, 2462 (Jan. 6, 1993).[14] Congress placed particular importance on the information that food producers must include on their products' principal display panels ("PDPs")—by adopting an express preemption provision for much of what appears on that panel. *See* 136 Cong. Rec. at s16611 (comments of Sen. Mitchell) (NLEA's preemption provision was "refined to provide national uniformity where it is most necessary").

The express preemption provision—relevantly titled "National uniform nutrition labeling"—clearly states that no state may "directly or indirectly establish . . . or continue in effect as to ***any food in interstate commerce*** . . . any requirement for the labeling of food that is not ***identical***" to the requirements cited by the preemption provision. 21 U.S.C. § 343–1(a)(1)-(5) (emphasis added).

---

[14] Codified at 21 U.S.C. § 343–1. *See also* 21 C.F.R. pt. 100.

Defendants' position on preemption requires the Court to agree with two severe misconceptions: that (1) the FDCA does not provide a "national uniform labeling" scheme for plant-based foods, and (2) the FDA has recognized "that it lacks any plant-based food labeling laws." Defs' Motion, Dkt. 52, at 12. Neither is true.

First, the National uniform nutrition labeling provision applies to any food in interstate commerce. 21 U.S.C. § 343–1(a)(1)-(5). Defendants' argument that the FDCA, and its express preemption provision, do not apply to plant-based foods, Defs' Motion, Dkt. 52, at 12, ignores the simple fact that plant-based meat products are "foods" as defined by the FDCA.[15]

Second, Defendants cannot point to anything to support their position that the FDCA does not apply to plant-based food products. Defendants' own agent tasked with enforcing the FDCA and state-level food labeling laws agrees that the same FDA rules and regulations that apply to all packaged food products apply to plant-based products. Ressler Dep., Ex. 8, at 70:6-17. Further, Defendants have arrived at the bizarre conclusion that "the FDA has recognized that there is not currently any 'uniform labeling scheme'" Defs' Motion, Dkt. 52, at 11, thanks to the existence of a draft guidance document addressing the labeling of plant-based meat products.[16] But guidance documents simply "describe FDA's interpretation of or policy on a regulatory issue," they do not supplant applicable laws or acknowledge the absence of relevant laws. *See, e.g.*, *Gitson v. Clover Stornetta Farms*, No. C-13-01517(EDL), 2014 WL 2638203, at *4 (N.D. Cal. June 9, 2014) (noting that, while FDA may be developing a guidance document on the relevant issue, there was already a governing FDA regulation that the court should defer to); *Samet v. Procter & Gamble Co.*, No. 5:12-

---

[15] For reference, 21 U.S.C. § 321(f) defines "food" as "articles used for food or drink for man or other animals, (2) chewing gum, and (3) articles used for components of any such article."

[16] Defendants also cite this document to support the assertion that "FDA is in the process of promulgating rules relating to labeling requirements for plant-based foods." Dkt. 52 at 16. Guidance documents such as this, even when made "final," are not rules. And the process of issuing a draft guidance can in no way be described as "promulgating rules" as meant under federal law. *See* 5 U.S.C. § 553 (governing rule making under the Administrative Procedure Act).

CV-01891 PSG, 2013 WL 3124647, at *1 (N.D. Cal. June 18, 2013) (holding that FDA's position was established by existing regulations, regardless of the Draft Guidance). Draft guidance related to plant-based products does not mean that existing federal labeling laws somehow do not apply to those products. Assuming otherwise strains both credulity and common sense.

> **B. FDCA's express preemption provision governs a product's common or usual name.**

The express preemption provision, 21 U.S.C. § 343(i)(1), lists labeling requirements which mandate the appearance of the common or usual name of a food if the food lacks a standard of identity. Contrary to Defendants' position, it is irrelevant that FDA "has specifically indicated that 'standards of identity have not been established for plant-based alternative foods." Defs' Motion, Dkt. 52, at 11. Prior cases and this Court have already dispensed with this argument. MTD Order, Dkt. 25, at 19-20; *Perea v. Walgreen Co.*, 939 F.Supp.2d 1026, 1038 (C.D. Cal. 2013) (finding that 21 U.S.C. § 343–1(a)(3) applies to statements of identity, "to find otherwise would allow the states to establish different or arbitrary labeling requirements for those products without a federal standard of identity, which would undermine the purpose of the NLEA to promote uniformity in food labeling."). NLEA's implementing regulations, 21 C.F.R. §§ 101.3 and 102.5, set forth the size, font and placement of a product's common or usual name as it should appear and require it to "accurately identify or describe, in as simple and direct terms as possible, the basic nature of the food or its characterizing properties or ingredients." *Id.* § 102.5. Any state law regarding a food product's statement of identity not contained in these regulations is preempted and unconstitutional under the Supremacy Clause.[17] *Id.*

---

[17] This Court has already held that "Plaintiff's claim for violation of the Supremacy Clause and Plaintiff's claim for federal preemption are one in the same." Dkt. 25 at 18.

**C. Defendants repeatedly acknowledge the Law imposes requirements different from and in addition to those imposed by the FDCA.**

"A state-law requirement is 'not identical to' federal requirements if 'the State requirement directly or indirectly imposes obligations or contains provisions concerning the composition or labeling of food that are not imposed by or contained in the applicable federal regulation or differ from those specifically imposed by or contained in the applicable federal regulation.'" *Hi-Tech Pharms., Inc. v. HBS Int'l Corp.*, 910 F.3d 1186, 1195 (11th Cir. 2018). Because the purpose of NLEA was to prevent states from adopting inconsistent labeling requirements, state regulations cannot displace federal labeling requirements. *In re: Whole Foods Mkt., Inc.*, 163 F.Supp.3d 385, 391 (W.D. Tex. 2016 (citing *Farm Raised Salmon Cases*, 175 P.3d 1170 (Cal. 2008)); *see Turek v. Gen. Mills, Inc.*, 662 F.3d 423, 426 (7th Cir. 2011) ("It is easy to see why Congress would not want to allow states to impose disclosure requirements of their own on packaged food products, most of which are sold nationwide. Manufacturers might have to print 50 different labels.") The Law imposes both additional and different requirements from those contained in the FDCA.

**1. The Law imposes requirements in addition to the FDCA.**

The FDCA does not explicitly require that plant-based meat products employ any specific qualifiers as a part of their common or usual names. State employees tasked with enforcing the Law as well as the FDCA—who obtain training by FDA, Ressler Dep., Ex. 8, 32:21-25, 33:5-15—have confirmed that the Law's specific terms constitute a new requirement compared to what's been historically required under federal law. *Id.* at 92:3-14 (testifying the Law's requirements are not in the federal regulations and are different from the federal labeling requirements); *see also* Stevenson Dep., Ex. 3, at 116:23-117:4 (testifying that S.B. 664 is "more specific" than federal law); Email from Dr. Timothy Stevenson to Joe Williams (Aug. 29, 2022), Ex. 13 (acknowledging the Law's requirements

are "different (more stringent) from Federal definitions/standards, which could create legal challenges").[18]

      2. **The FDCA allows significant flexibility regarding a product's common or usual name and it does not require that any specific qualifiers be attached to a trade name, brand name, or product name.**

The FDCA requires a product's name to appear only once on the PDP. 21 C.F.R. § 101.3. According to FDA guidance on labeling regulations, "[b]rand names are not considered to be statements of identity."[19] Yet the State has variously taken the position that the "product name," (the element the qualifying terminology must attach to under the Law), is (1) "the language most prominently displayed on the front of the container," MTD, Dkt. 17, at 30, (2) the product's brand name (e.g., "Frosted Flakes"), *id.* at 31, (3) the product's statement of identity, Ressler Dep., Ex. 8, at 46:1-5, or (4) some combination of these terms. *See supra* III.A.

Taking these in turn, if the qualifying term must attach to the most prominently displayed language on the PDP, this is likely not the product's statement of identity—so the Law is requiring *more* information relating to the "product name" that is *not* required by the FDCA labeling regulations governing product names. The same holds true if the qualifying term must attach to a product's brand name, trade name, or characterizing flavor statement. And even if the qualifying term must attach to the statement of identity, because the Law more specifically prescribes what that common or usual name can be, the Law's text creates additional *and* different requirements for common or usual names than the FDCA and is therefore preempted.

---

[18] State labeling requirements for products' statements of identity are preempted if they are not identical to the labeling requirement set forth by NLEA. *Regan v. Sioux Honey*, 921 F.Supp.2d 938, 944 (E.D. Wis. 2013) (citing *Nat'l Council for Improved Health v. Shalala*, 122 F.3d 878, 880 (10th Cir. 1997)).

[19] FDA Guidance for Industry: Food Labeling Guide, available for download at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/guidance-industry-food-labeling-guide

### 3. The Law's prominence requirements are additional to the FDCA's prominence requirements

The FDCA dictates that "any word, statement . . . required by or under authority of this chapter" must be "prominently placed" on the product's label "with such conspicuousness (as compared with other words, statements, designs, or devices, in the labeling) and in such terms as to render it likely to be read and understood by the ordinary individual under customary conditions of purchase and use." *Id.* § 343(f).

Contrastingly, the Law requires qualifying language to appear "in prominent type equal to or greater in size than the surrounding type and in close proximity to the name of the product . . ." Tex. Health & Safety Code § 431.082(d-1). Quoting Defendants themselves, the FDCA "regulates placement generally on the product," while "S.B. 664 discusses the size of the font." Dkt. 52 at 22. Defendants confirmed that Texas' requirements were "more specific" than federal rules. Stevenson Dep., Ex. 3, at 116:23-117:4. *See also* Ressler Dep., Ex. 8, at 99:9-21, 120:3-4 (agreeing that the Law is different from FDA's regulations). Defendants thus expressly concede that the Law's prominence provision is necessarily different from, and imposes requirements in addition to, those of the FDCA.

### V. The Law Violates the Dormant Commerce Clause.

"[I]t is settled that because Congress can regulate interstate commerce, the states cannot erect barriers to the free flow of that commerce." *NextEra Energy Capital Holdings, Inc. v. Lake*, 48 F.4th 306, 317 (5th Cir. 2022). A state law "violates the dormant Commerce Clause where it discriminates against interstate commerce either facially, by purpose, or by effect." *Allstate Ins. Co v. Abbott*, 495 F.3d 151, 160 (5th Cir. 2007) (citing *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 270 (1984)). "If the statute impermissibly discriminates, [whether facially, by purpose, or by effect,] then it is valid only if the state 'can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest.'" *Allstate*, 495 F.3d at 160 (quoting *C&A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511 U.S. 383, 392 (1994)).

29

"If the statute does not discriminate, then the statute is valid unless the burden imposed on interstate commerce is 'clearly excessive' in relation to the putative local benefits." *Allstate,* 495 F.3d at 160 (citing *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142 (1970)); *see NextEra Energy,* 48 F.4th at 326-27 (if the effects on interstate commerce are "only incidental," then *Pike* balancing test applies). Under the *Pike* balancing test, courts evaluate "legitimate" local interests by looking at "evidence before or available to [lawmakers] that might have supported their judgment." *Ford,* 264 at 503-04 (quoting *Kassel v. Consolidated Freightways Corp. of Del.,* 450 U.S. 662, 680-81 (1981) (J. Brennan, concurring)). Specifically, "whether the lawmakers could rationally have believed that the challenged regulation would foster those purposes." *Id.*

The Law was drafted alongside the conventional meat industry and intended from the jump to discriminate against primarily out-of-state plant-based meat producers to the disproportional benefit of in-state meat and poultry firms. The Law also has the practical effect of discriminating against interstate commerce by significantly hampering the ability of plant-based firms to compete in the interstate market. And it fails *Pike* balancing by significantly burdening interstate commerce in exchange for an alleged state "benefit" without a shred of credible evidence.

### A.  The Law discriminates against interstate commerce in purpose and effect.

### 1.  The Law purposefully discriminates against the interstate market for plant-based meat to benefit in-state meat and poultry producers.

In the Fifth Circuit, a statute's purpose is evaluated under five factors: "'(1) whether the effect of the state action creates a clear pattern of discrimination; (2) the historical background of the action, which may include any history of discrimination by the decisionmakers; (3) the 'specific sequence of events leading up' to the challenged state action, including (4) any departures from normal procedures[;] and (5) 'the legislative or administrative history of the state action, including contemporary statements by decisionmakers.'" *Wal-Mart Stores, Inc. v. Tex. Alcoholic Beverage Comm'n,*

945 F.3d 206, 214 (5th Cir. 2019). Discrimination must have been "a substantial or motivating factor" in passing the law. *Veasey v. Abbott*, 830 F.3d 216, 231 (5th Cir. 2016) (citation omitted).

Here, there was clear collaboration between the legislature, executive agency, and Texas meat and poultry industry groups leading up to the Law's passage. As the bill's sponsor, Representative Buckley—who himself runs a cattle operation—put it: "[i]t's important to talk about this issue for Texas farmers and ranchers and Texas agriculture." Julie Tomascik, *Meat labels subject of truth in labeling bill*, Tex. Farm Bureau (Mar. 9, 2023). As Rep. Buckley's statements made clear: "[t]he burden is on those who come forth with another type of product." Bob Sechler, *What is 'beef'? Texas bill would block imitations from using the term*, Chi. Trib. (Jan. 29. 2021), https://perma.cc/Z3LB-D766.

Texas meat and poultry industry representatives, such as the Texas Cattle Feeders Association ("TCFA"), were involved in every step of the Law.[20] TCFA met with legislative and executive agency staff on earlier versions of the bill and on draft legislative language before the session in which S.B. 664 was introduced. Stevenson Dep., Ex. 3, at 197:3-14, 200:4-13 (confirming notes from call between TCFA, Senator Perry's office, and the Department in August 2022); *see also* , Notes from March 26, 2021 Call, Ex. 14, (TCFA met with DSHS staff, including providing a list of terms they wanted plant-based companies to stop using); Email from Zachary Flores, DSHS, to Cynthia Hernandez, HHSC (Mar. 24, 2021), Ex. 16 ("Yesterday H.B. 316 [a precursor to S.B. 664] author Rep. Buckley's office, along with Josh Winegardner with [TCFA] called with questions regarding our suggested committee substitute language . . . Their goal is to finalize language by the end of this week.").

---

[20] "Strong backing" by local business interests can be a factor in favor of finding a discriminatory purpose. *See NextEra Capital Holdings*, 48 F.4th at 327 (citing *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 32 (1980), in which "strong backing of the local financial community" was cited as evidence of discriminatory purpose). Likewise, passing a facially neutral law that excludes new entrants to a market in response "to the entry of a disfavored group could support a finding of discriminatory purpose." *Id.*

The Texas cattle industry knows plant-based meat products directly compete with in-state animal products. Ransom Decl., Ex. 1, at ¶10; Public Hearing on S.B. 664 Before the Senate HHS Committee, 2023 Leg., 88th Sess. (May 29, 2023), https://perma.cc/GUS7-J3UW (statement of Dustin Dean, Member, Texas Southwest Cattle Raisers Association) ("we do not oppose the creation of new synthetic or alternate meat substitutes in fact we welcome the competition"); Email from Zachary Flores, DSHS, to Greg Wilburn, DSHS, Ex. 15, (Mar. 30, 2021) (noting that Sen. Perry referred to plant-based products as the "anti-meat" market during Senate testimony). Faced with competition from out-of-state plant-based companies, Texas animal-based producers worked with the legislature to pass S.B. 664 and impose new burdens on their direct competitors.

In addition to meeting with legislators and regulators prior to the bill's passage, TCFA and the Texas Farm Bureau ("TFB") provided written materials to legislators that influenced legislative decision-making. Rep. Buckley said a poll they conducted "was really an eye-opener for me. It really told me that this was legislation that's good for Texans." Julie Tomascik, *Meat labels subject of truth in labeling bill*, Texas Farm Bureau (Mar. 9, 2023), https://perma.cc/W8LC-ZU65.[21]

Throughout the legislative and rulemaking process, staff for both the sponsoring legislator and the Department tasked with enforcement referred to S.B. 664 as the "fake meat" bill. *E.g.*, Email from Jimmy Charney to Kevin Veal et al. (Apr. 3, 2023), Ex. 17; Email from Jimmy Charney to Lisa Bruedigan et al. (Feb. 6, 2023), Ex. 18; Email from Timothy Stevenson to Zachary Flores (Feb. 12, 2024), Ex. 19; Government Affairs Updates (Nov. 15, 2024), Ex. 20; Email from Robert Papierz to

---

[21] This survey has mysteriously disappeared. TCFA and TFB never published any data or results publicly, and when asked for the survey in an open records request, Rep. Buckley's office said it had no responsive records. Defendants similarly testified that they were unaware of the Department ever receiving a copy. Stevenson Dep., Ex. 3, at 134:17-19. Defendants "were unable to identify any responsive documents" in response to a request for production of studies, polls, or consumer surveys. RFP One Resp., Ex. 11, at No. 4.

Zachary Flores (Apr. 3, 2023), Ex. 21. The Deputy Commissioner for Consumer Protection admitted such characterization is pejorative. *See* Stevenson Dep., Ex. 3, at 180:20-181:3,.[22]

    Texas legislators and regulators appear to have intended to target an entirely out-of-state section of the market for the benefit of in-state firms. Defendants' testimony that they are unaware of any plant-based meat manufacturers in Texas, Stevenson Dep., Ex. 3, at 55:24-56:2,[23] demonstrates the thinking of regulators: that *all* burdened businesses were out-of-state. The Supreme Court has "condemn[ed] as illegitimate" such protectionist efforts. *Or. Waste Sys., Inc. v. Dept. of Envtl. Quality of State of Or.*, 511 U.S. 93 at 106 (1994) ("any governmental interest that is not 'unrelated to economic protectionism'" is illegitimate).

    To the extent Defendants attempt to proffer a defense to their discriminatory treatment of plant-based meat products, they allude to Texas' choice to "regulate . . . one industry but not [] others, because of the risk of fraud." Defs' Motion, Dkt. 52, at 6 (citations omitted). Yet, nowhere in the record can Defendants point to a single piece of evidence suggesting that the risk of fraud is greater in the market for plant-based products.

    Taken together, all this evidence points to the substantial role discriminatory intent played in the passage of S.B. 664. Applying the factors enumerated in *Wal-Mart Stores*, the Law clearly targets plant-based companies for discrimination—without any evidence justifying disparate treatment, the sequence of events leading up to the Law's passage shows collaboration with incumbent industries that would benefit from the Law, and contemporary statements by sponsoring legislators demonstrate pejorative treatment of out-of-state plant-based producers who will bear "[t]he burden" of new regulation. *See* 945 F.3d at 214. As such, the Law is discriminatory and "virtually *per se*

---

[22] The National Cattlemen's Beef Association has also been fighting "fake meat" through working on labeling bills like S.B. 664 across the country. Bob Sechler, *What is 'beef'? Texas bill would block imitations from using the term*, Chi. Trib. (Jan. 29, 2021), https://perma.cc/Z3LB-D766.

[23] To the best of Plaintiffs' knowledge, there is a single small plant-based producer in Texas.

invalid." *Hignell-Stark v. City of New Orleans*, 46 F.4th 317, 325 (5th Cir. 2022) (quoting *Dep't of Revenue v. Davis*, 553 U.S. 328, 338 (2008)). To overcome this showing, Defendants must demonstrate that the Law "advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Id.* Defendants have not done so here. *See supra* II.B.; *infra* V.A.3.

**2. The Law has the effect of discriminating against out-of-state plant-based meat producers and benefiting in-state meat and poultry producers.**

The Commerce Clause exists to "protect[] the interstate market, not particular interstate firms from prohibitive or burdensome regulations." *Wal-Mart Stores*, 945 F.3d at 223 (quoting *Exxon*, 437 U.S. at 127-28). In *Exxon*, the Supreme Court upheld a law for which the burden fell primarily on interstate companies because "(1) [t]he prohibition did not restrict interstate dealers in the retail market; (2) did not restrict the flow of interstate goods; (3) did not place added costs on interstate goods; and (4) did not distinguish between in-state and out-of-state retailers in the market." *Id.* (citing *Exxon*, 437 U.S. at 126). The present case is different from both *Wal-Mart Stores* and *Exxon*. The Law restricts the interstate flow of goods, and as such has the practical effect of discriminating against interstate producers and the interstate market.

Plaintiffs do not allege they are being targeted as individual firms; they allege that out-of-state producers, and the interstate market for plant-based meat products, are being subjected to prohibitively burdensome regulations. Ransom Decl., Ex. 1, at ¶4. As Plaintiffs' expert Julie Emmett explained, modern distribution channels—including regional distributor "middlemen" as well as online retailers like Amazon—generally require firms to "provid[e] uniform packages that can be legally sold in all states." Emmett Rep., Ex. 5, at 6-7; *see also* Ransom Decl., Ex. 1, at ¶3 (Tofurky sells via distributors). It is "technically impossible" for sellers to choose which states their products end up in. Emmett Rep., Ex. 5, at 7. This is precisely why the FDCA and NLEA created a national

labeling regime. *See supra* IV.A. Texas' attempt to impose additional requirements impermissibly burdens the interstate protein market, and as such is unconstitutional.

### 3.  The Law is not the only means to advance a legitimate state interest.

Discriminatory laws trigger strict scrutiny. *See Hughes v. Oklahoma*, 441 U.S. 322, 337 (1979) ("facial discrimination invokes the strictest scrutiny"); *Churchill Downs Inc. v. Trout*, 589 Fed. Appx. 233, 237 (5th Cir. 2014) ("discriminatory effects" trigger strict scrutiny). To survive, the State must demonstrate "that it has ***no other means to advance a legitimate local interest***." *Allstate*, 495 F.3d at 160 (emphasis added). This "extremely difficult burden," *Camps Newfound/Owatonna, Inc. v. Town of Harrison, Me.*, 520 U.S. 564, 582 (1997), means that "once a state law is found to discriminate against interstate commerce, 'it is typically struck down without further inquiry.'" *NextEra Energy Capital Holdings, Inc. v. Jackson*, 756 F.Supp.3d 428, 448 (W.D. Tex. 2024) (quoting *Chem. Waste Mgmt., Inc. v. Hunt*, 504 U.S. 334, 342 (1992)).

Here, the State has not asserted a *legitimate* local interest furthered by the Law.[24] Nor can it, as, by Defendants' own admission, there have been no reports or complaints of Texas consumers confusing plant-based meat for animal-based meat, despite the long history of these products in the marketplace. *See supra* II.B.1. "[C]ourts must look for 'concrete evidence' that the statute 'actually promotes public health or safety.'" *Wal-Mart Stores*, 945 F.3d at 213. This "standard has teeth," and requires more than "mere speculation" or "unsupported assertions." *Id.* At no stage did the legislature or enforcement agency provide concrete support for the assertion that consumers were confused about the nature of plant-based products. This lack of support is sufficient to find the asserted interest illegitimate. See *Freeman v. Corzine*, 629 F.3d 146, 161 (3d Cir. 2010) ("This absence of evidence is dispositive, because '[t]he burden is on the State to show that the discrimination is

---

[24] The Commerce Clause "demand[s] more than mere speculation to support discrimination against out-of-state goods." *Granholm*, 544 U.S. at 492. Defendants have not provided any support for the validity of their asserted local interest.

demonstrably justified.'") (quoting *Granholm v. Heald*, 544 U.S. 460, 492 (2005)) But Plaintiffs have gone further and proffered empirical evidence that consumers are *not* confused by plant-based labels and that the Law may *actually cause* consumer confusion. *See supra* II.A.1.

Even if Defendants could point to a legitimate local interest, the challenged Law must be "sufficiently related" to promoting the asserted interest. *NextEra*, 756 F.Supp.3d at 450; *see Granholm*, 544 U.S. at 490 ("Without concrete evidence that direct shipping of wine is likely to increase alcohol consumption by minors, we are left with the States' unsupported assertions."); *Bryd v. Tenn. Wine & Spirits Retailers Ass'n*, 883 F.3d 608, 627 n.10 (6th Cir. 2018). S.B. 664 is not "sufficiently related" to the reduction of alleged consumer confusion. *See NextEra*, 756 F.Supp.3d at 450; *supra* II.B.1.

Furthermore, there are reasonably nondiscriminatory alternatives. In *NextEra*, the court noted Texas already had multiple ways of achieving its state interest already built into its regulatory process. 756 F.Supp.3d at 451; *see id.* at 453;[25] *see also C & A Carbone*, 511 U.S. at 393 ("Clarkstown has any number of nondiscriminatory alternatives for addressing the health and environmental problems alleged to justify the ordinance in question. The most obvious would be uniform safety regulations enacted without the object to discriminate."). Here, Texas similarly already has the tools to go after misbranded food products. *See supra* II.B.1. If there was a problem of plant-based companies misleading consumers as to the contents of their products, Texas could readily use existing law to prevent such misbranding, or enact a less burdensome regulation. *See supra* II.B.

**B.  The Law violates the *Pike* balancing test by gravely burdening interstate commerce in clear excess of any putative legitimate local interest.**

"[E]ven nondiscriminatory burdens on commerce may be struck down on a showing that those burdens clearly outweigh the benefits of a state or local practice." *Nat'l Pork Producers Council v.*

---

[25] In *NextEra*, a court in this District also considered the absence of similar laws. 756 F.Supp.3d at 452 ("[t]he vast majority of states do not have a ban…like Texas"). Here too is Texas an outlier, as the vast majority of states do not target plant-based meats in this way. Swistara Decl. ¶4.

*Ross*, 143 S. Ct. 1142, 1168-69 (2023) (Roberts, C.J., concurring in part) (citing *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970)); *see Allstate*, 495 F.3d at 160. When applying the *Pike* test, courts consider: "(1) whether the law burdens interstate commerce; (2) whether there is a 'legitimate local interest' in the law; and (3) when both are present, if the extent of the burden should be tolerated based on the local interest involved, including if the interest 'could be promoted *as well* with a lesser impact on interstate activities.'" *Wal-Mart Stores*, 945 F.3d at 221 (citing *Pike*, 397 U.S. at 142). S.B. 664 places a great burden on the interstate market for plant-based meat products and does not advance a legitimate local interest.

### 1.  The Law gravely burdens interstate commerce.

"A statute imposes a burden when it inhibits the flow of goods interstate." *Allstate*, 495 F.3d at 163. The Law impedes the nationwide distribution of plant-based meat products—so much so that it could threaten the very existence of a nationwide plant-based meat market if it is not enjoined. *See* Emmett Rep., Ex. 5, at 15 (". . . if plant-based brands were discontinued by retailers due to Texas's unique labeling requirements, the implications would be devastating—it could potentially wipe out the entire industry.").

Modern American supply chains make it "technically impossible" for sellers to choose which states their products end up in. Emmett Rep., Ex. 5, at 7. Companies like Tofurky do not sell directly to consumers. Ransom Decl., Ex. 1, at ¶3. Distribution chains rely on middlemen to ensure food products get from producers to consumers. *Id.* For example, online retailers like Amazon deliver into all fifty states, including Texas. And once the product is in Amazon's hands, Plaintiffs can no longer control which state it ends up in. Emmett Rep., Ex. 5, at 6-7.

The same goes for retail grocers that operate their own distribution across the country. "Most U.S. retailers have stores located across multiple states." Emmett Rep., Ex. 5, at 12. And manufacturers generally get their products into all locations or none of them. *Id.* Retailers that differ

(i.e., sell at only some of their locations) are less common and do so only "at *their* discretion." *Id.* Once the product leaves Tofurky's dock, it is under the control of the retail chain to distribute amongst its store locations as it sees fit. Ransom Dep., Ex. 4, at 23:13-23 (some of Tofurky's "larger customers" like "Walmart, Target, Kroger" "manage their products through their own logistics distribution network[s]"). Distributors and retail chains with their own distribution channels move products around nationally in a way that manufacturers like Tofurky cannot control. Some of Tofurky's customers and distributors "have distribution centers in Texas" but "all of the distribution centers pass products around regionally so we can't control which products land in Texas because [] they're moved throughout the region according to the distribution centers' inventory needs." Ransom Dep., Ex. 4, at 48:5-11.

If a company like Tofurky tried to pressure customers or distributors into segregating its Texas-specific products, or avoiding Texas altogether—both logistically unviable tasks—those entities would likely cut off business ties. National or regional distributors typically require firms to "provid[e] uniform packages that can be legally sold in all states." Emmett Rep., Ex. 5, at 6-7. Companies requesting segregation and distribution restrictions are likely more trouble than they are worth, particularly in plant-based meat, a sub-sector of the market still composed of relatively small firms. "Retailers do not have a system to warehouse certain products with certain labels only for stores in one area, like Texas. If a brand must have certain labeling for Texas alone, a retailer ***will not accept that brand for distribution***. This is true for distributors, too, and is especially true for online retailers, who often do not even know which products end up where." Emmett Rep., Ex. 5, at 12 (emphasis added); *see also id.* at 13 ("One of the nationwide companies interviewed above also pointed out that they have significant offerings and investment in private label plant-based offerings that would no longer be viable in any of their stores.").

All this means that plant-based meat companies cannot wholly avoid the Texas market, nor fully segregate products with Texas-specific labels. "It is an insurmountable burden in terms of sales and distribution to have brands fundamentally change their label in such a large way for one state alone." Emmett Rep., Ex, 5, at 12. A patchwork of labeling requirements "would stymie and effectively kill nationwide distribution of packaged food products." *Id.* at 13.

### C. The Law does not serve a legitimate local interest.

To burden interstate commerce, a state must provide "concrete evidence . . . showing that [the Law] actually promotes public health or safety." *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 540 (2019). Far short of the required "concrete evidence," Defendants have not demonstrated even a scintilla of evidence that consumers are confused—nor that the Law will redress this fictious harm. *See supra* II.B., V.A.3.

If Defendants could point to any real consumer confusion, that alone is not enough to justify burdening interstate commerce—the Law must further the stated goal. Seeking to prevent conduct that is already illegal does not confer legitimate status on an alleged local interest. *See TelTech Systems, Inc. v. Barbour*, 866 F.Supp.2d 571, 577 n.4 (S.D. Miss. 2011) ("Since fraud is already illegal, both under state and federal law, the Act adds nothing toward improving the prevention or investigation of fraud."). As in *TelTech Systems*, Defendants can articulate only one supposed benefit, that the Law prevents misbranding of plant-based meat products—something which is neither happening (by Defendants' own admission) nor permitted under existing federal and state laws.

Even if Defendants had demonstrated a non-pretextual legitimate interest that the Law advances, they would still need to provide evidence "that nondiscriminatory alternatives would be insufficient to further those interests." *Tenn. Wine*, 588 U.S. at 540; *see also C&A Carbone,* 511 U.S. at 393 (arguments for laws that burden the interstate flow of commerce "must be rejected absent the

clearest showing that the unobstructed flow of interstate commerce itself is unable to solve the local problem"). Defendants have not done so here.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion for Summary Judgment and grant Plaintiffs' Motion for Summary Judgment.

Date: August 28, 2025

Respectfully submitted,

*/s/  Morgan Boutilier*
Morgan Boutilier (admitted *pro hac vice*)
ANIMAL LEGAL DEFENSE FUND
5666 Wilshire Blvd. #1597
Los Angeles, CA 90036
(707) 795-2533
mboutilier@aldf.org

Michael Swistara (admitted *pro hac vice*)
ANIMAL LEGAL DEFENSE FUND
150 South Wacker Drive, Suite 2400
Chicago, IL 60606
(707) 795-2533
mswistara@aldf.org

Amanda Howell, Bar No. 24078695
ANIMAL LEGAL DEFENSE FUND
2108 N St., Ste. N.
Sacramento, CA 95816
(707) 795-2533
ahowell@aldf.org

Martin Woodward, Bar No. 00797693
KITNER WOODWARD PLLC
13101 Preston Road, Suite 110
Dallas, TX 75240
(214) 443-4300
martin@kitnerwoodward.com

Madeline Cohen (admitted *pro hac vice*)
THE GOOD FOOD INSTITUTE
1120 Connecticut Ave. NW, Suite 1080
Washington, DC 20036
(202) 743-3963
madelinec@gfi.org

Tarak Anada, Bar No. 24090576
JONES WALKER, LLP
811 Main Street, Suite 2900
Houston, Texas 77002
(504) 582-8322
tanada@joneswalker.com

**ATTORNEYS FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing instrument has been served

electronically through the court's CM/ECF electronic-filing system on the 28th day of August, 2025,

to:

William H. Farrell
Texas Bar No. 00796531
Office of the Attorney General
P.O. Box 12548, Capital Station
Austin, Texas 78711-2548
Email: biff.farrell@oag.texas.gov

**Counsel for Defendants**

/s/ Morgan Boutilier

Morgan Boutilier (admitted *pro hac vice*)
ANIMAL LEGAL DEFENSE FUND
5665 Wilshire Blvd., #1597
Los Angeles, CA 90036
(707) 795-2533
mboutilier@aldf.org

**Attorney for Plaintiffs**