# Exhibit 1

```
 1              IN THE UNITED STATES DISTRICT COURT
 2               FOR THE WESTERN DISTRICT OF TEXAS
 3                         AUSTIN DIVISION
 4    _____
 5    PLANT BASED FOODS ASSOCIATION
 6    and TURTLE ISLAND FOODS INC.,
 7            Plaintiffs,
 8        v.                               Case No.
 9    JENNIFER SHUFORD, in her             1:23-cv-01032
10    official capacity as
11    Commissioner of State Health
12    Services, et al.,
13            Defendants.
14    _____
15               DEPOSITION OF LEWIS RESSLER
16    DATE:          Thursday, April 24, 2025
17    TIME:          9:12 a.m.
18    LOCATION:      Remote Proceeding
19                   Office of the Attorney General of Texas
20                   300 West 15th Street
21                   Austin, TX 78701
22
23    OFFICIATED BY:
24    Kanoelani Manalo
25    JOB NO.: 7334706

                                                     Page 1
```

Veritext Legal Solutions
Calendar-CA@veritext.com 866-299-5127

```
 1         A P P E A R A N C E S
 2  ON BEHALF OF PLAINTIFFS PLANT BASED FOODS ASSOCIATION
 3  AND TURTLE ISLAND FOODS INC.:
 4     AMANDA HOWELL, ESQUIRE (by videoconference)
 5     Animal Legal Defense Fund
 6     525 East Cotati Avenue
 7     Cotati, CA 94931
 8     ahowell@aldf.org
 9     (707) 795-2533
10
11     MORGAN BOUTILIER, ESQUIRE (by videoconference)
12     Animal Legal Defense Fund
13     5665 Wilshire Boulevard, Suite 1597
14     Los Angeles, CA 90036
15     mboutilier@aldf.org
16     (707) 795-2533
17
18  ON BEHALF OF DEFENDANT JENNIFER SHUFORD:
19     WILLIAM H. FARRELL, ESQUIRE
20     Office of the Attorney General
21     P.O. Box 12548, Capital Station
22     Austin, TX 78711
23     biff.farrell@oag.texas.gov
24     (800) 621-0508
25
                                                  Page 2
```

```
 1       A P P E A R A N C E S (Cont'd)
 2  ON BEHALF OF DEFENDANT JENNIFER SHUFORD:
 3     RUTH CHAMBLISS, ESQUIRE
 4     RACHEL LEINEN, ESQUIRE
 5     Texas Health and Human Services Commission
 6     4601 West Guadalupe Street
 7     Austin, TX 78751
 8     ruth.sunday@hhs.texas.gov
 9     rachel.leinen2@hhs.texas.gov
10     (512) 424-6500
11
12  ALSO PRESENT:
13     Karen, Legal Assistant, Texas Health and Human
14     Services Commission
15
16
17
18
19
20
21
22
23
24
25
                                                  Page 3
```

```
 1              I N D E X
 2  EXAMINATION:                              PAGE
 3     By Ms. Howell                            7
 4
 5              E X H I B I T S
 6  NO.          DESCRIPTION                   PAGE
 7  Exhibit 1   Health and Safety Code Title 6  52
 8  Exhibit 2   Regulations                     54
 9  Exhibit 3   Bill Summaries for the DISH
10              Newsletter                     100
11  Exhibit 4   String of Emails               141
12  Exhibit 5   Compliance Section Consumer Safety
13              Branch Powerpoint              147
14
15        D O C U M E N T S  R E Q U E S T E D
16  NO.          DESCRIPTION                   PAGE
17  1    Public Health Employment History      13
18
19
20
21
22
23
24
25
                                                  Page 4
```

```
 1              P R O C E E D I N G S
 2          THE OFFICER:  Good morning, everyone.
 3  My name is Kanoelani Manalo; I am the reporter
 4  assigned by Veritext to take the record of this
 5  proceeding.  We are now on record at 9:12 a.m. Central
 6  Time.
 7          This is the deposition of Lewis
 8  Ressler, taken in the matter of Plant Based Foods
 9  Association, et al. vs Jennifer Shuford, et al., on
10  Thursday, April 24, 2025.  The reporter is located in
11  Austin, Texas, and the witness is in Austin, Texas as
12  well.
13          I am a notary authorized to take
14  acknowledgements and administer oaths in Texas, and
15  parties agree that I will swear in the witness
16  remotely.
17          Additionally, absent an objection on
18  the record before the witness is sworn, all parties
19  and the witness understand and agree that any
20  certified transcript produced from the recording of
21  this proceeding:
22            - is intended for all uses permitted
23              under applicable procedural and
24              evidentiary rules and laws in the
25              same manner as a deposition recorded
                                                  Page 5
```

```
 1  by the local health department.
 2         Local health departments are able to get out
 3  and -- and do inspections much quicker than we can.
 4  So depending on the public health significance and
 5  the, you know, various issues that we might look at,
 6  it's really on a case by case basis that we have to do
 7  that.  But generally it would just be mostly complaint
 8  basis.
 9         But there are some inspectors who may go
10  into the -- to those places a little bit more often
11  just because of where they're located.  Let's say in
12  West Texas, for example, there's less manufacturers
13  than in -- in Dallas, Fort Worth, or Houston, so.
14     Q   In your time in the current Department of
15  State Health Services, have you ever -- you said, you
16  know, you said it's rare to go in to check the
17  retailers.  Have you ever in that time -- so this is
18  an artful question.  Have you ever -- are you familiar
19  with anyone checking just the labels of products on
20  the shelves at retailers, or just the -- the food
21  safety side of things produced by the retailer?
22     A   I -- I mean I can't -- I can't tell you for
23  certain that -- that they -- that they have or have
24  not.  I -- I can say that it's -- it's completely
25  under the -- we -- we could look at the -- the labels
```
Page 30

```
 1  while we're there, if we -- if we -- something caught
 2  our eye or whatever it might be.  Of course a -- a
 3  retailer has way too many products for an inspector to
 4  look at, you know, every individual product in
 5  evaluate its label, but it is possible that they could
 6  look at labeling for another product that's maybe not
 7  been manufactured by the retailer itself.
 8         Generally we are focusing on the retailer
 9  produced manufactured foods, you know, things that
10  they have put in, you know, like a sandwich that they
11  put in a -- in a container and put a label on it.
12     Q   Can you think of any instance in your
13  personal knowledge that someone's decided to, you
14  know, inspect and found a problem with a label when
15  they were there at a retailer?
16     A   I can't recall anything.  It -- I can only
17  tell you by logic that it's -- it -- I'm sure it's
18  happened, I just don't have an instance that I -- I
19  can recall.
20     Q   Have you ever found a problem with a label
21  when you're visiting a retailer, or am I just -- or
22  I'm sorry, scratch that.  I think actually a better
23  question is it's my understanding that while you're in
24  charge of the inspections, you don't actually conduct
25  the inspections yourself?
```
Page 31

```
 1     A   That's correct.  Our -- our compliance
 2  officers, myself have the authority to go out and do
 3  inspections.  We have inspection credentials
 4  and -- and are, you know, agents of the state.  We
 5  could -- we could go in, but it's not our job to do
 6  so, so we -- we generally do not conduct any
 7  inspections ourselves.
 8     Q   And so who does?
 9     A   We have an inspections branch.  We have five
10  inspection branches for -- for different areas of the
11  state located in San Antonio, Austin.  The Austin
12  people cover all of West Texas and the panhandle.  We
13  got folks in the Dallas Fort Worth area, and then
14  there's Houston area, and then East Texas.  So the San
15  Antonio folks cover like a lot of -- all of South
16  Texas, all the way down to the valley.  So those five
17  different branches, they are the ones who are in
18  charge of making sure that the -- our routine
19  inspections or compliance inspections and whatnot get
20  done.
21     Q   And who provides like training to them to
22  make sure that they're doing their inspections
23  properly?
24     A   It's a mix.  The -- the -- the inspectors go
25  to a lot of FDA training.  FDA provides a lot of
```
Page 32

```
 1  training on their regulations and -- and sanitation
 2  labeling, you name it.  Different types of -- of
 3  regulations that we do have, like seafood HACCP and
 4  juice HACCP are both specialized regulations
 5  that -- that FDA -- that we cover that FDA will give
 6  us training on.
 7         We also train them ourselves.
 8  Inspectors -- the inspection branches will conduct
 9  training for -- for their inspectors.  A lot of the
10  on -- on the job training, you know, taking people out
11  to do inspections, showing them how -- showing them
12  the ropes and all that.  And then we also do some
13  training, but mostly it's -- it's the inspection
14  branches that -- that train their folks themselves,
15  and then also FDA, lots of FDA training.
16     Q   So would you say that the training that you
17  do yourselves focuses more on the state level stuff
18  that doesn't also overlap with FDA?
19     A   No.  It -- it all really overlaps.
20  It -- it's just everything that we do, you know, we
21  are in constant contact with FDA.  There's always, you
22  know, there's an issue in Texas, there'll -- there's
23  going to be conversations; who's going to cover it,
24  who can have -- you know, can get out there, who's got
25  the resources, that kind of thing.
```
Page 33

9 (Pages 30 - 33)

```
 1        Most of our regulations that we have in
 2  place are going to -- are going to be very closely
 3  related to the FDA ones.  Of course, as I mentioned
 4  previously, we -- we have adopted most of the FDA
 5  regulations that pertain to manufacturing and
 6  wholesaling of foods in -- in Texas.
 7      Q   Is that because FDA regulations are pretty
 8  comprehensive so you don't need to adopt additional
 9  ones?
10      A   Yes, that's correct.
11      Q   And so they're pretty comprehensive for food
12  safety and a labeling stock?
13      A   Yes, very.
14      Q   Okay.  Earlier you said something about, you
15  know, you might end up at a retailer based on the
16  complaints.  Is that a complaint from a consumer?
17      A   I'm sorry, would you repeat that?
18      Q   Yeah.  Would that be a complaint from like a
19  consumer who had been at the retailer and saw a
20  problem that concerned them?
21      A   Yes, that's -- in general, that's -- that's
22  where the complaints come from.
23      Q   Have you ever, in your experience, gotten a
24  complaint about a labeling issue at a retailer?
25      A   Oh yes, of course.
                                                    Page 34
```

```
 1      Q   What do those look like?
 2      A   A lot of times it just -- it depends.  Most
 3  of the time, you know, people who are very sensitive
 4  to allergens and they come across something -- maybe
 5  something that made them sick, they will complain
 6  about the -- you know, "Well I got sick or something
 7  happened to me, and I think this product has something
 8  in it."
 9          The -- the issue with -- with retailers is
10  that they have lots of products that are not made in
11  Texas, so we have to evaluate it, see where that
12  product was made, determine where it was made.  If it
13  was made in Texas, then we can follow up with a firm.
14  If it wasn't, then we will have to -- to refer that to
15  FDA as they -- as they regulate interstate commerce.
16      Q   And is that because of a jurisdictional
17  issue?
18      A   Yes, as -- as if the -- let's say for
19  example the, the product was made in Louisiana.  We
20  don't have any jurisdiction over Louisiana, so we'd
21  have to send it to FDA.  FDA may send it to Louisiana
22  for investigation, you know, the state of Louisiana.
23  But -- but that's after we refer it to FDA,
24  that's -- it's in their -- the ball's in their court
25  and they take it from there.
                                                    Page 35
```

```
 1      Q   What if the issue is with a state
 2  regulation?
 3      A   If it's an issue with a state regulation,
 4  like we find something at, for example, one of those
 5  grab and go sandwiches, then -- then we would do
 6  the -- the inspection.  Let's say if it's a labeling
 7  issue, especially if it's allergen related, where we
 8  would likely go ahead and enter the complaint, have it
 9  sent over to one of our inspection branches for
10  investigation.
11      Q   So regarding retail inspections about
12  labeling, so it's like pretty narrowed down, what
13  percentage of those kind of like inspections and
14  further actions involve allergens, would you say?
15      A   I -- I couldn't put an exact number on it,
16  but it is a -- a high number of -- of -- high number
17  of our complaints are related to allergens.
18          I -- I don't have a specific number.  I -- I
19  and -- and I really didn't prepare to, you know, see
20  if -- if, you know, "Hey, like can we see how many
21  allergen -- or how many labeling complaints we get,"
22  and -- and that kind of thing.  But it -- it's
23  just -- anecdotally it's -- it's a good percentage.  I
24  would even maybe even go as far as seeing the, you
25  know, the majority over 50 percent, but I can't say
                                                    Page 36
```

```
 1  for sure.
 2      Q   More than 50, but not like 90, or like?
 3      A   I wouldn't know.  I -- I'm a -- I'm a
 4  numbers person, so I hate to give a number and then be
 5  completely wrong.  But, you know, it just feels like
 6  most of our -- our -- you know, the anecdotal evidence
 7  is that it seems that most of our -- a lot of our
 8  complaints come coming about labeling is related to
 9  allergens.
10      Q   I almost tried to make a joke about like
11  hazarding a guess, and like the hazards, like the
12  HASSA protocols, but I couldn't get there.  So glad we
13  skipped that.
14          Have you ever gotten a complaint from a
15  consumer saying, "You have to check out this retailer"
16  because they thought a plant-based meat product was
17  actually meat?
18      A   No, I -- we don't -- I don't have any record
19  of -- of such a complaint coming through.
20      Q   I think we like kind of went down a little
21  rabbit hole there.  I kind of wanted to jump back to
22  your current position, and like who had that position
23  before you.
24      A   The -- the person who had the position
25  before me was named Claire Perkins.
                                                    Page 37
```

| | |
|---|---|
| 1  Q  And A-I-R or A-R-E?  Do you know?<br>2  A  How do you spell her name?<br>3  C-A -- C-L-A-I-R-E.<br>4  Q  Okay.  And sorry to not -- we won't tell<br>5  Claire that you didn't know how to spell her name.<br>6  How long was she there before you?<br>7  A  I don't know.  I -- I don't know how long<br>8  she was the manager.<br>9  Q  Do you know why she left, or when she left?<br>10  A  She -- she retired.<br>11  Q  Did you guys overlap at all?<br>12  A  Well she was my manager, but no, we -- when<br>13  she retired, I was still a compliance officer<br>14  for -- for whatever amount of time it took for them to<br>15  hire the position.<br>16  Q  So that was a while ago then?<br>17  A  Yeah, at least a month or so.<br>18  Q  And one thing that I kind of want to hear a<br>19  little bit more is, you know, it sounds like you're<br>20  pretty -- you're very knowledgeable about like the FDA<br>21  regulations.  How did you get that training?<br>22  A  Through FDA.  We -- we have a computer-based<br>23  training, a lot of it.  And then we also do classroom<br>24  training as well.<br>25  Q  Okay.  Do you get separate training on<br>Page 38 | 1  that kind of thing.<br>2  Q  So you said the legislative analysis, and<br>3  you seem like a good human, so I'm going to assume<br>4  you're not a lawyer; right?<br>5  A  I'm not a lawyer.<br>6  Q  Do you like that joke?<br>7     MR. FARRELL:  Objection.  Objection to<br>8  all of that.<br>9     THE WITNESS:  I was going to say,<br>10  I -- I -- there's some lawyers here, and you seem like<br>11  a very nice person too.<br>12  BY MS. HOWELL:<br>13  Q  Yeah.  I'm a Michigander, I think -- I hope<br>14  that I'm nice, but I like to joke too.  So you're not<br>15  a lawyer, but you provide the legislative analysis.<br>16  So what does that look like?  What are the opinions<br>17  that you're rendering in a bill?<br>18  A  Generally we -- when we're looking at<br>19  a -- at a bill, we're trying to determine how will we<br>20  implement that bill, how does it affect the program,<br>21  would we need more staff, would it conflict with any<br>22  existing regulations, that -- that kind of thing.<br>23     We're -- we're really looking at how is it<br>24  going to, you know, if we were -- if this bill passed,<br>25  how would we implement it?  How would we -- how would<br>Page 40 |
| 1  regulations that are like adopted by the state that<br>2  are different than FDA regs?<br>3  A  Yes.  I mean we -- we -- generally when<br>4  we're looking at a new regulation, that -- that's very<br>5  rare in -- in -- on our program just because a -- a<br>6  lot of the regulations have been around for -- for<br>7  decades as far as, you know, sanitation and -- and,<br>8  you know, adulteration, misbranding type issues<br>9  with -- with foods.  So when we have a new regulation,<br>10  then a lot of times we'll be the ones doing the<br>11  training because we're the -- we do the -- like a bill<br>12  comes through, we're the ones that analyze it, I guess<br>13  I should have -- that would have been one of the<br>14  things that I forgot earlier.<br>15     I said, you know, when I was put on the<br>16  spot, I couldn't remember.  We are required to do all<br>17  the legislative analysis and cost -- cost estimates,<br>18  or at least providing information for those.  Once we<br>19  are -- once that bill passes, we are required to do<br>20  the implementation of that.  If it -- if it is our<br>21  bill or if it is our regulation, we have to do<br>22  the -- we have to make sure it gets implemented.  And<br>23  so part of that implementation generally is training,<br>24  making people aware of what the new regulation<br>25  entails, what -- you know, what to be looking for,<br>Page 39 | 1  it affect us and what, you know, what staff -- what<br>2  changes might we need to make to -- in order to -- to<br>3  be able to implement that -- that bill.<br>4  Q  So do you ever opine on like whether a bill<br>5  or the, you know, the regulations that would implement<br>6  that law are necessary in order to protect, you know,<br>7  the consumer food safety and all the concerns that are<br>8  under your purview?<br>9  A  That's bill analysis.  We have very specific<br>10  questions that we have to answer, and that hasn't been<br>11  a question that we've been required to answer in -- in<br>12  the past.<br>13  Q  I think I saw some of those documents, like<br>14  check boxes, does it require additional fiscal impact.<br>15  Like is that kind of --<br>16  A  Yes.<br>17  Q  Okay.  So you said that one of the things<br>18  that you do is make sure it doesn't conflict with<br>19  existing regulations?<br>20  A  Correct.<br>21  Q  If it did, how would you kind of flag that?<br>22  A  We'll provide an explanation under that<br>23  particular question and just explain where there could<br>24  be issues with existing regulations and just -- just<br>25  try to go ahead and -- and just put it all in there.<br>Page 41 |

11 (Pages 38 - 41)

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.